UNITED STATES, Appellee

v.

John S. FREEMAN, Senior Airman
U.S. Air Force, Appellant

No. 06-0833

Crim. App. No. 35822

United States Court of Appeals for the Armed Forces

Argued November 5, 2007

Decided February 1, 2008

STUCKY, J., delivered the opinion of the Court, in which EFFRON, C.J., and BAKER, ERDMANN, and RYAN, JJ., joined.


<u>Counsel</u>

For Appellant:  Captain Vicki A. Belleau (argued); <u>Lieutenant Colonel Mark R. Strickland</u> and <u>Captain John S. Fredland</u> (on brief).

For Appellee:  Captain Brendon K. Tukey (argued); <u>Colonel Gerald R. Bruce</u> and <u>Major Matthew S. Ward</u> (on brief); <u>Lieutenant Colonel Robert V. Combs</u>.

Military Judges:  Patrick M. Rosenow and Kurt D. Schuman


<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

Judge STUCKY delivered the opinion of the Court.

We granted review to determine whether the military judge committed prejudicial error by failing to suppress Appellant's confession, by denying the defense request for the appointment of a forensically-qualified expert consultant at government expense, and by admitting evidence of uncharged misconduct and bad character in violation of Military Rule of Evidence (M.R.E.) 404(b). We conclude the military judge did not commit prejudicial error and affirm the decision of the United States Air Force Court of Criminal Appeals.

## I. Facts

Appellant met KS at a New Year's Eve party on December 31, 2001, and she moved in with Appellant the next day. One month later, KS moved out.

On February 6, 2002, KS spent the evening with friends, one female and three male, at her apartment. During the evening, KS smoked marijuana and consumed fourteen to fifteen shots of alcohol. She got sick at about 11:15 p.m., but rejoined the group for five minutes before leaving the room to lie down. The last thing KS remembered before passing out was looking at the clock just after midnight.

The only other woman at the apartment, Ms. Dawn Montoya, asked the men to leave, and locked two doors to the apartment; after awakening KS, Ms. Montoya observed KS appear to lock the

front door.  Once in her car, Ms. Montoya waited five to ten minutes, until the men drove away, before she left.

KS woke up in the shower with blood on her head, pain in her left hand, and the tip of her finger almost severed.  She recalled that light from a flashlight was blinding her and a man was telling her that she had twenty-four minutes to shower and then she was "going to die."  At the time, she thought the person speaking to her was Private First Class (PFC) Bob Garmon, one of the friends she had been drinking with earlier that night.  KS fled to her neighbor's house and was taken to the hospital.

A physical examination at the hospital revealed KS had suffered a two-inch cut on her forehead, two black eyes, a broken nose, cuts on her head needing sutures, an amputated fingertip, bruises on her back and chest, abrasions on her forearms, other head injuries requiring staples, and significant blood loss.

The next day, KS told the police and Ms. Montoya that three Hispanic men had broken into her house and raped her.  She identified PFC Garmon as a possible suspect.  KS never identified Appellant as being at her home on the night of the attack.

A general court-martial with members convicted Appellant of making a false official statement and assault with a means or

force likely to cause death or grievous bodily injury. Articles 107 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 928 (2000). The convening authority approved Appellant's sentence to a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The United States Air Force Court of Criminal Appeals affirmed the findings and sentence. United States v. Freeman, ACM No. 35822, 2006 CCA LEXIS 160, 2006 WL 1976504 (A.F. Ct. Crim. App. Jun. 13, 2006) (unpublished).

## II. Admission of Evidence

Appellant asserts that the military judge erred by admitting both uncharged misconduct and his involuntary confession into evidence. We review a military judge's decision to deny a motion to suppress evidence -- like other decisions to admit or exclude evidence -- for an abuse of discretion. United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995). "Abuse of discretion" is a term of art applied to appellate review of the discretionary judgments of a trial court. An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law. See United States v. Rader, 65 M.J. 30, 32 (C.A.A.F. 2007). "Further, the abuse of discretion standard of review recognizes that a judge has a range of

4

choices and will not be reversed so long as the decision remains within that range." United States v. Gore, 60 M.J. 178, 187 (C.A.A.F. 2004) (citing United States v. Wallace, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)).

## A. The Confession

### (1) Law

A confession is involuntary, and thus inadmissible, if it was obtained "in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." M.R.E. 304(a), (c)(3); see Article 31(d), UCMJ, 10 U.S.C. § 831(d) (2000). The prosecution bears the burden of establishing by a preponderance of the evidence that the confession was voluntary. United States v. Bubonics, 45 M.J. 93 (C.A.A.F. 1996) (citing M.R.E. 304(e); United States v. D.F., 63 F.3d 671, 679 (7th Cir. 1995)). The voluntariness of a confession is a question of law that we review de novo. Arizona v. Fulminante, 499 U.S. 279, 287 (1991); United States v. Bresnahan, 62 M.J. 137, 141 (C.A.A.F. 2005).

We examine "the totality of the surrounding circumstances" to determine "whether the confession is the product of an essentially free and unconstrained choice by its maker." Bubonics, 45 M.J. at 95.

>     In determining whether a defendant's will was over-
> borne in a particular case, the Court has assessed the
> totality of all the surrounding circumstances -- both
> the characteristics of the accused and the details of
> the interrogation.  Some of the factors taken into
> account have included the youth of the accused, e.g.,
> Haley v. Ohio, 332 U.S. 596; his lack of education,
> e.g., Payne v. Arkansas, 356 U.S. 560; or his low
> intelligence, e.g., Fikes v. Alabama, 352 U.S. 191;
> the lack of any advice to the accused of his
> constitutional rights, e.g., Davis v. North Carolina,
> 384 U.S. 737; the length of detention, e.g., Chambers
> v. Florida, supra; the repeated and prolonged nature
> of the questioning, e.g., Ashcraft v. Tennessee, 322
> U.S. 143; and the use of physical punishment such as
> the deprivation of food or sleep, e.g., Reck v. Pate,
> 367 U.S. 433.  In all these cases, the Court
> determined the factual circumstances surrounding the
> confession, assessed the psychological impact on the
> accused, and evaluated the legal significance of how
> the accused reacted.  Culombe v. Connecticut, supra,
> at 603.

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (concerning voluntariness of consent to search) (footnote omitted); United States v. Ellis, 57 M.J. 375, 379 (C.A.A.F. 2002) (plurality opinion).

If we find the confession involuntary, we must set aside the conviction unless we determine the error in admitting the confession was harmless beyond a reasonable doubt.  Fulminante, 499 U.S. at 285.

(2)  Discussion

Appellant neither contests the military judge's findings, nor asserts that he was not advised of his Article 31, UCMJ/M.R.E. 305 rights or that he did not knowingly and

6

intelligently waive those rights.  Instead, Appellant avers that his confession was obtained by the interrogators' "use of coercion, unlawful influence, or unlawful inducement," Article 31(d), UCMJ; M.R.E. 304(c)(3), and that the military judge incorrectly applied the law to the facts of this case.  He claims his will was overborne by the following:

(1)  The length of the interview;

(2)  The interrogators' intimidation of Appellant by invading his personal space;

(3)  The interrogators' use of the following lies, threats, and promises:

(a)  That they would tell Appellant's commander whether or not he cooperated;

(b)  That witness and fingerprint evidence contradicted his denials;

(c)  That the sooner they completed the interrogation, the sooner everyone could go home and Appellant could get on with his life;

(d)  That they would turn Appellant over to civilian authorities if he did not cooperate;

(e)  That civilian punishment would be harsher, especially since the victim was a civilian; and

(f)  That he would be sent to jail for a long time if he did not cooperate.

To determine the voluntariness of Appellant's confession, we apply the two-part test from Schneckloth.

(a) The characteristics of the accused favor a finding of voluntariness.

The military judge found that Appellant was a twenty-three-year-old E-4 when he was first questioned by Special Agent (SA) James Bogle of the Air Force Office of Special Investigations (AFOSI) on March 8, 2002. Appellant was advised of his rights to counsel and to remain silent, and waived those rights. Appellant personally prepared a seven-page typed statement in which he revealed the nature of his relationship with KS, but denied any wrongdoing or knowledge of the attack. Appellant also agreed to a polygraph examination. Between the first interview and the March 21, 2002, polygraph examination, Appellant had thirteen days to seek counsel or decline further interviews. He did not do so. There was no evidence that he was not of average intelligence, had not completed high school, could not read and write, or was in any way mentally impaired. Appellant claimed he had six hours of sleep before reporting for the polygraph and denied any fatigue, hunger, thirst, or other problems. He never complained about the process, never asked for an attorney, never asked to stop the interview or leave, or in any other way indicated that he felt coerced or pressured into making a statement.

8

(b)  The details of the interrogation, while less definitive, also favor a finding of voluntariness.

At 9:06 a.m. on March 21, 2002, when Appellant presented himself at the AFOSI office for the polygraph examination, SA Steven Larson advised Appellant of his rights.  Appellant acknowledged those rights, waived them, and agreed to answer questions.  SA Larson explained a form consenting to a polygraph which contained an additional rights advisement.  Appellant waived his rights in writing and consented to the examination.

During the pre-polygraph interview, which took approximately one hour, SA Larson advised Appellant of the procedures for administering the polygraph and requested personal, medical, and psychological information from Appellant. Appellant was then given a twenty-minute break.

After the first test, which took thirty minutes (from 10:26 a.m. to 10:58 a.m.), SA Larson gave Appellant a one-hour break so SA Larson could analyze the charts.  Appellant, permitted to leave the interview room, went outside and smoked.  When SA Larson returned, he informed Appellant that the results were "indiscernible" and he would have to retest.  Appellant agreed to a second exam which was conducted between 11:52 a.m. and 12:16 p.m.  After the second polygraph exam, Appellant was given another break, until 12:45 p.m., while SA Larson reviewed the

charts.  SA Larson concluded that Appellant was deceptive with regard to his denial of any knowledge of KS's injuries.

When the interview resumed at 12:45 p.m., SA Larson rearranged the furniture in the room so that Appellant was directly in front of him.  He told Appellant that the polygraph exam results indicated he had been deceptive.  Here, the interview turned into more of an interrogation, but SA Larson did not shout or curse at Appellant.  After an hour, there was a seven-minute break, during which time Appellant was given water. After the break, SA Bogle took over the questioning.  SA Bogle began by asking if Appellant understood he was still under rights advisement; Appellant responded affirmatively.  At 3:03 p.m., they took another break.  SA Larson left and SA Scott Mann joined SA Bogle.  The interview continued from 3:40 p.m. until 5:30 p.m. and then from 5:50 p.m. until 6:10 p.m.  At that time, SA Bogle left Appellant alone with a computer so he could type out his statement.  During the interrogation, SA Bogle raised his voice slightly above a conversational level only once. After he completed the statement, SA Bogle asked Appellant if he wanted to include the oral statements he had already made about the injuries shown in the photographs.  Appellant included it in his statement, which was completed at 7:30 p.m.

10

During the interview, Appellant was offered food, water, and other beverages.  He accepted the offer of water but declined any food or other beverages.

The military judge also found the following:

> Over the course of the interview, SA Bogle suggested to the accused that everyone makes mistakes and the best thing to do is admit it and get it behind you.  He promised the accused that if he cooperated, they could tell his commander about it and it might help.  On the other hand, he told the accused, if you don't tell the truth, the case will go downtown and with a civilian victim you could get five years in jail.  When the accused denied being out that night, SA Bogle lied to him and told him a witness saw him out.  He also told the accused that his fingerprints were found at the scene.

There has been considerable controversy over the treatment of threats and promises in assessing the voluntariness of a confession.  Before Fulminante was decided in 1991, a confession "'obtained by any direct or implied promises, however slight,'" was not voluntary.  Bram v. United States, 168 U.S. 532, 542-43 (1897) (quoting 3 H. Smith & A. Keep, Russell on Crimes and Misdemeanors 478 (6th ed. 1896)).  Thus, in Lynumn v. Illinois, 372 U.S. 528, 534 (1963), the Supreme Court held that a confession was coerced when the defendant was told she could lose her welfare payments and the custody of her children, but if she cooperated the police would help her and recommend leniency.  The Court reiterated that a coerced confession

required reversal of the conviction even when there was sufficient other evidence to convict.  Id. at 537.

Since Fulminante, however, promises are considered only a factor in the equation; they are not of themselves determinative of involuntariness.  See, e.g., United States v. Gaskin, 190 F. App'x 204, 206 (3d Cir. 2006); United States v. Jacobs, 431 F.3d 99, 109 (3d Cir. 2005).  Similarly, lies, threats, or inducements are not determinative either.  See, e.g., United States v. Mendoza, 85 F.3d 1347, 1350-51 (8th Cir. 1996) (holding that an investigator's threat of immediate arrest if he did not cooperate did not overbear the accused's will); Ledbetter v. Edwards, 35 F.3d 1062, 1069-70 (6th Cir. 1994) (holding that an investigator's use of a series of psychological ploys, including lying about evidence, staging a phony identification, and showing charts and graphs allegedly linking the accused to the crime did not result in an involuntary confession); Welch v. Butler, 835 F.2d 92, 95 (5th Cir. 1988) (holding statements resulting from investigator's three-hour prayer session did not make the accused's confession involuntary).  After all, as the "Miranda rules were issued to counter-balance the psychological ploys used by police officials to obtain confessions," the presence of those ploys could hardly be considered to per se result in an involuntary confession. United States v. Leiker, 37 M.J. 418, 420 (C.M.A. 1993).

Appellant's argument relies, to a great extent, on two cases: United States v. Bubonics, 40 M.J. 734 (N.M.C.M.R. 1994), aff'd, 45 M.J. at 93, and United States v. Sennett, 42 M.J. 787 (N-M. Ct. Crim. App. 1995). In both cases, the lower court held that the prosecution failed to establish the voluntariness of the confession under a totality of the circumstances. In Bubonics, investigators employed a good-guy/bad-guy technique and threatened the accused with arrest by local authorities unless he cooperated. 45 M.J. at 93. One of the investigators "stormed into the room; vented his wrath; 'yell[ed] at the accused that he didn't have time for the accused, and that he could sign a warrant to have him arrested by the [local civilian police]'; and 'slammed the door when he left the door way . . . .'" Id. at 96. The Judge Advocate General of the Navy certified the issue to this Court and, with little explanation, we adopted the lower court's opinion on this issue. Id. In Sennett, the accused waived his rights and made a brief oral statement to investigators. 42 M.J. at 790. Investigators then confronted him with a "booking order" for a local civilian jail and "told [him] that a written statement was needed or he could ask for a lawyer and be taken to the county jail." Id. After the accused made the written statement, the investigators delivered him to that civilian jail for

13

incarceration without a warrant or a written agreement required by Navy regulations.  Id. at 789.

We do not find these cases controlling in the context of this case.  As the application of the totality of circumstances standard rests with the particular facts of each case, a threat to turn an accused over to civilian law enforcement is but one factor to weigh.  We do not examine each of the facts separately but rather in conjunction with all the other facts in the case.  Ellis, 57 M.J. at 379 (citing United States v. Martinez, 38 M.J. 82, 87 (C.M.A. 1993)).  Bubonics and Sennett offer little in the form of controlling precedent on how to weigh the facts in this particularly distinct situation.

Our decision in Ellis is instructive.  In that case, the accused had confessed to abusing his child.  57 M.J. at 378.  We held that his confession was voluntary despite the detective's warning that there was sufficient evidence to arrest both the accused and his wife for child abuse, potentially resulting in their other children being removed from their home and being placed in foster care.

> While the detectives' advice to appellant concerning removing the remaining children from the home may have contributed to his confession, the mere existence of a causal connection does not transform appellant's otherwise voluntary confession into an involuntary one. . . .

> Not only must we examine the circumstances surrounding the taking of the statement regarding what

> was done or said, but we must also examine what was not done or not said. There were no threats or physical abuse. The questioning did not continue for days; there was no incommunicado detention, and no isolation for a prolonged period of time.
>
> . . . .
>
> Viewing all the facts taken together, we agree with the Court of Criminal Appeals that they were not "so inherently coercive as to overcome the appellant's will to resist."

Id. at 379 (citations omitted).

In the instant case, the interrogation may have lasted almost ten hours, but Appellant had several breaks in which he left the interrogation room, went outside, and smoked. He was provided water and declined offers for other food and drink. Admittedly, the agents lied to Appellant: They claimed to have witnesses who saw him out that night and that his fingerprints had been found at the crime scene. They advised him they would tell his commander whether he had cooperated and threatened to turn the case over to civilian authorities, where he would face stiffer punishment, if he did not cooperate. But he was neither physically abused nor threatened with such abuse. Although he made admissions to law enforcement agents before he prepared the written statement, he prepared the statement himself, outside the presence of any investigator. Under the totality of the circumstances, Appellant's confession was voluntary.

15

## B.  Uncharged Misconduct

Over defense objection, the military judge admitted into evidence three alleged incidents of Appellant's prior misconduct toward KS:  (1) grabbing KS by her purse and swinging her around; (2) following KS into a bathroom to finish an argument, at which point she slapped him to get him out of the bathroom; and (3) arguing and shoving each other over some french fries. The Air Force Court of Criminal Appeals held that the military judge erred in selecting the particular reason for admitting the evidence and in providing a confusing instruction to the members.  Freeman, 2006 CCA LEXIS 160 at *9-*10, 2006 WL 1976504 at *4.  Nevertheless, the court concluded the error was harmless.  2006 CCA LEXIS 160 at *9-*10, 2006 WL 1976504 at *4-*5.

Assuming the military judge erred in admitting the evidence, we agree with the Court of Criminal Appeals that the error was harmless.  The three acts are relatively minor and, in the context of the entire record, and in particular Appellant's confession, we are convinced such error did not have a substantial influence on the members' verdict.  United States v. Harrow, 65 M.J. 190, 200 (C.A.A.F. 2007) (citing Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

16

III.  Expert Consultant

A.  Facts

Before trial, Appellant's counsel asked the convening authority to appoint, at government expense, a defense confidential consultant in sociology, with a specialty in police interrogation techniques.  Appellant claimed he needed the assistance of an expert to analyze the oral and written statements purportedly made by Appellant, to assist in interviewing the AFOSI agents, to help formulate cross-examination questions, and to advise the defense on interrogation techniques.  He claimed this assistance was necessary to help counsel determine whether Appellant's "rights were violated and whether such interrogation techniques overwhelmed SrA Freeman's free will."  He indicated that the expert might be called to testify about interrogation techniques, their purpose, and their potential coercive effect. The convening authority disapproved the request.

At trial, the defense counsel renewed the request for an expert consultant in police interrogations but modified the reasons for the request.

> While the defense intends to raise the issue of
> whether or not the [sic] SrA Freeman's "statement" was
> voluntary in another motion, the defense does not seek
> to focus the expert's assistance on whether the
> statement is voluntary.  The focus of the request is
> on interrogation techniques not SrA Freeman's
> personality or compliant nature. . . .  Nowhere in the

17

      listed duties is the expert requested to do "personality tests" on SrA Freeman to explore his tendency toward being compliant or over [sic] suggestible. Quite to the contrary, the request details duties consistent with a focus on the interrogation techniques used in this case. . . . Furthermore, we are not at this time requesting that this expert testify concerning his or her findings . . . .

        . . . .

      . . . This expertise is necessary for the defense team to determine the likelihood that SrA Freeman confessed to a crime he did not commit. . . . to reconstruct the interrogations, so the defense team can formulate an understanding as to why SrA Freeman made statements regarding a crime he did not commit.

The military judge denied the motion. He first explained the "science" of false confessions as follows: "(1) the police already have incriminating evidence; (2) he'll be convicted no matter what he does; and (3) cooperation and admission will lead to leniency; he is much more likely to tell interrogators what he thinks they want to hear." The military judge concluded that "none of the factors/practices identified [in an article] by Dr. Ofshe [one of the proponents of the theory] are particularly complex or counter-intuitive" and counsel "should require no expert assistance or testimony to elicit the pertinent facts and argue to the finder of fact why those facts make their client's admissions to the [AF]OSI unreliable . . . ."

On appeal before this Court, Appellant suggests he needed the expert assistance to challenge the admissibility as well as

18

the reliability of the confession.  He focuses on the possibility that the expert would testify on the motion or on the merits.

## B.   Law

   "[S]ervicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense." United States v. Garries, 22 M.J. 288, 290 (C.M.A. 1986); accord Bresnahan, 62 M.J. at 143 (citing United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001)).  The mere possibility of assistance is not sufficient to prevail on the request. Bresnahan, 62 M.J. at 143.  Instead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial.  Gunkle, 55 M.J. at 31-32 (citing United States v. Robinson, 39 M.J. 83, 89 (C.M.A. 1994)).  To establish the first prong, the accused "must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop."  Bresnahan, 62 M.J. at 143.  We review the military judge's decision for an abuse of discretion.  Id.

19

C.  Discussion

Appellant failed to establish the third part of the first prong of the test.  We will examine the parts separately.

(1)  Why the expert assistance was needed:

At trial, Appellant claimed that the expert assistance was needed because "[d]efense counsel does not possess the requisite knowledge or expertise in this area to ensure that the right questions are asked and the correct themes developed to paint a realistic picture of what happened during the interrogation and the tactics used by the interrogators."

(2)  What the expert assistance would accomplish for the accused:

At trial, the defense shifted the focus of the expert's utility away from voluntariness of the confession to what happened during Appellant's interrogation:

> While the defense intends to raise the issue of whether or not the [sic] SrA Freeman's "statement" was voluntary in another motion, the defense does not seek to focus the expert's assistance on whether the statement is voluntary.  The focus of the request is on interrogation techniques not SrA Freeman's personality or compliant nature. . . .
>
> . . . .
>
> . . . This expertise is necessary for the defense team to determine the likelihood that SrA Freeman confessed to a crime he did not commit. . . . to reconstruct the interrogations, so the defense team can formulate an understanding as to why SrA Freeman made statements regarding a crime he did not commit.

20

The defense included in the motion a citation to an article by Dr. Richard Ofshe, which discussed the psychology behind interrogation techniques and how they could lead to false confessions.

(3)  Why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop:

> At trial, Appellant claimed as follows:

> [T]he defense team does not possess the academic or practical experience to perform the necessary analysis the expert consultant would be able to perform. Reading the literature on the subject and interviewing the interrogators is not sufficient to ensure that SrA Freeman is able to present a defense in this area. . . .  It is absolutely vital that an expert in the field be appointed to assist the defense in knowing which questions to ask and which areas to address during their interviews and cross examination. An expert who has vast experience in this area of science brings elements and abilities to the defense team that we can simply "not learn in books."

This is not the first time this issue has been before this Court.  In Bresnahan, the accused confessed to shaking his three-month-old baby in a manner that eventually caused death after being told that, in order to save the baby's life, the doctors need to know exactly what he had done.  62 M.J. at 140. At trial, he asked for expert assistance to determine if his confession was unreliable because of the techniques employed by the interviewing detective.  Id. at 139.  We accepted arguendo that the expert "possessed knowledge and expertise in the area of police coercion beyond that of the defense counsel and that

21

defense counsel could benefit from his assistance." Id. at 143. Nevertheless, we held that the military judge did not abuse his discretion in denying the defense request for expert assistance. Id. The defense counsel never established why they themselves were unable to gather and present any evidence that the expert would have been able to develop. Id. at 143-44.

We accept arguendo the consultant's expertise. Although it is by no means clear that the expert would add anything that could not be expected of experienced defense counsel, we also accept arguendo that Appellant's counsel could benefit from the consultant's assistance. Nevertheless, we conclude that the military judge did not abuse his discretion in denying the defense request for expert assistance because Appellant failed to establish the necessity for that assistance. After all, what defense counsel really wanted was knowledge of interrogations that they could have obtained themselves. They failed to establish why they were unable to gather the relevant information and cross-examine the investigators on their interrogation techniques and their use of those techniques in eliciting a confession.

## IV.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.