# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
GLANVILLE, ALDYKIEWICZ, and MARTIN[1]
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private E1 JUSTIN S. CHATMAN**
**United States Army, Appellant**

ARMY 20120494

Headquarters, Joint Readiness Training Center and Fort Polk
Kirsten V.C. Brunson, Military Judge
Colonel Keith C. Well, Staff Judge Advocate

For Appellant: Captain Brian J. Sullivan, JA (argued); Colonel Kevin Boyle, JA; Lieutenant Colonel Peter Kageleiry, JA; Major Amy E. Nieman, JA; Captain J. Fred Ingram, JA (on brief).

For Appellee: Captain Sean P. Fitzgibbon, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Elisabeth A. Claus, JA; Captain Sean P. Fitzgibbon, JA (on brief).

11 June 2014

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

GLANVILLE, Chief Judge:

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of three specifications of larceny and three specifications of burglary, in violation of Articles 121 and 129, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 921, 929 (2006). The convening authority approved appellant's adjudged sentence to a bad-conduct discharge, confinement for fourteen months, and reduction to the grade of E-1.

---
[1] Judge MARTIN took final action in this case prior to her permanent change of station.

CHATMAN—ARMY 20120494

The above-captioned case is now before this court for review pursuant to Article 66, UCMJ.[2] Appellant raises two assignments of error. First, appellant argues that the purported incriminating statements to law enforcement were inadmissible "because they were made following a military police investigator's assurances that appellant would not be prosecuted if he cooperated with law enforcement" and the military judge abused her discretion in limiting any "promised immunity" to the possession of stolen property, an uncharged offense. Second, appellant argues that the "corroborating evidence to appellant's confession" regarding Specialist PG, one of the three victims, was "inadmissible testimonial hearsay." Appellant's first assignment of error has merit, and thus, the court need not address appellant's second assignment of error or those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## BACKGROUND

The above-captioned case involves a simple barracks larceny of three rooms by appellant while the victims, members of appellant's unit, were in the field on a training exercise ("FTX") from 5-9 December 2011. Appellant stayed behind as a member of the rear detachment. This case also involves two different interviews of appellant by Military Police Investigation ("MPI"). Both of appellant's MPI interviews were videotaped, incorporated in the defense's 17 May 2012 suppression motion, and offered as prosecution exhibits (*i.e.*, Pros. Ex. 1A, 1B, and 2)[3] during the government's case-in-chief.

In the early morning hours of 8 December 2011, appellant used his rear detachment status to burglarize three barracks rooms belonging to members of his company who were in the field on an FTX: Specialist (SPC) JS, SPC KS, and SPC PG. Appellant unlawfully gained entry into the locked rooms by using a master key, after which he carried various items of personal property belonging to the three soldiers to his car, thereafter taking the property to his off-post apartment. The stolen property included three televisions, three video game consoles, video game controllers, assorted video games, and a laptop computer.

---

[2] Oral argument in this case was heard in Durham, N.C. on 23 January 2014 at North Carolina Central University School of Law as part of the "Outreach Program" of the United States Army Court of Criminal Appeals.

[3] The first MPI interview began on the evening on 10 December 2011 and ended in the early morning hours of 11 December 2011. This interview is captured collectively in Pros. Ex. 1A and 1B. The second interview began and ended on the same day, 12 December 2011. This interview is captured in Pros. Ex. 2.

On the evening of 9 December 2011, SPC JS, SPC KS, and SPC PG returned from their five-day FTX to find their barracks rooms burglarized. After notifying the chain of command, law enforcement was contacted, and the victims provided statements documenting those items taken from their respective rooms.

The following day, 10 December 2011, SPC KS, along with another soldier, went to see appellant at his off-post apartment. While inside, SPC KS observed what he believed to be some of his stolen property, observations that prompted SPC KS to provide a second military police report documenting what he observed. The focus of the criminal investigation then shifted to appellant.

Later that day, appellant was at the MPI office for what would be the first of his two videotaped interviews. Appellant's presence at the MPI office was the result of him being brought in for the interview by law enforcement personnel. Contemporaneously, law enforcement authorities searched appellant's apartment, however, the search failed to discover any of the stolen property.

*10-11 December 2011 Interview (Interview #1)*

As noted above, appellant's first MPI interview began the evening of 10 December 2011. Appellant's interviewer was Investigator E. Appellant's interactions with Investigator E began sometime after 2000, 10 December 2011 and ended shortly before 0300 the next morning, 11 December 2011. The videotaped interview lasted just over one hour and forty-five minutes.

At the start of the videotaped interview, appellant was advised of his Article 31, UCMJ, rights. During the course of the interview, Investigator E made no less than five statements regarding the following: (1) coordination with the prosecution or garrison commander vis-à-vis helping appellant, (2) immunity, and (3) no-prosecution in exchange for action by appellant.

Thirteen minutes into the interview, Investigator E told appellant, "I have a real big influence with the prosecutor as far as what happens to subjects." Less than three minutes later, after telling appellant he did not believe the denials of involvement, Investigator E said, "I wish you would help yourself out and bring that [sh--] to light so I got something to tell the prosecutor instead of just saying hem him up." As the interview progressed, Investigator E advised appellant of the possible sentence for "housebreaking and larceny," a period of confinement that did not include additional confinement for conspiracy and being an "accessory" because appellant was in possession of the stolen property.

After nearly an hour, Investigator E discussed how appellant would not be charged for simply possessing stolen property, telling him,

3

> [I]f you didn't have anything to do with it and you're just holding for some - - something for somebody else, the only thing you can really get hit with is possession of stolen property. However, if you lead the prosecutor to who really did this [sh--] they're not gonna charge you for that - - that's piddly [sh--]. You're a witness now, you're not a subject. Right now you're a subject; you're the subject.

As the interview continued, appellant brought up "Carlos," the alleged burglar and thief. Appellant suggested that he could coordinate with Carlos to try and get the stolen property back. This course of action, however, was unacceptable to Investigator E.

After stepping out of the interview room and purportedly speaking with the prosecutor, Investigator E advised appellant, "I just talked with the prosecutor and there is [sh--] we can do to help you out." Investigator E continued, "You're gonna have to give me some information . . . . You're gonna have to start giving me some fact (sic) man, cause I'm trying to work with you . . . . I just called the prosecutor at 12:30 at night, told him a little about the situation." At this point, Investigator E again advised appellant that all the evidence pointed to him as the burglar and thief. Investigator E then shifted focus to what could be done to help appellant out, again referencing the prosecutor: "the prosecutor has already said man that he's willing - - you know, we're - - they're willing to work - - to work [sh--] out - - if you're legitimately honest. . . . I mean, we can work with you."

After further give and take, appellant told Investigator E that Carlos gained entry into the barracks rooms using a master key and appellant was simply holding the property for Carlos at his apartment. Upon hearing this, Investigator E advised appellant, in part, "[I]f you wouldn't have told that [sh--] you were gonna get charged. . . . But now I've got something to go off of. So I'm gonna stay true to my word and I'm not gonna charge you. But there's gonna be some conditions on that . . . . [Y]ou gotta cooperate with us, from here on out. . . . I mean you're a part of this now, on our side. So you're not gonna get [f---ed] with; aint gonna charge you." Investigator E added, "[R]ight now you're on my side. You went from being the person I was trying to get; now you're on my side."

At the close of the interview and after advising appellant again that he was not being charged, Investigator E placed limits on what appellant could do and who appellant could speak with. Investigator E told appellant: "I told you I was gonna work with you. I aint [bullsh---ing] you because you aint getting charged. . . . Be loyal to me and help us out with this investigation and we'll - - I mean we'll be loyal to you." After telling appellant he was "gonna walk tonight," Investigator E advised appellant that "there's gonna be conditions on who you can talk to about this [sh--]. You can't talk to anybody about this [sh--], nothing, this is it." Investigator E

4

characterized the discussions as "protected information." Investigator E ended the interview by referencing the garrison commander and MPI's influence over him, stating: "we report directly to the garrison commander, so, whatever we need to do to help you out, as long as you help us out, it can get done."

*12 December 2011 Interview (Interview #2)*

Thirty-six hours after the initial MPI interview, appellant was back at the MPI office. This time, appellant was interviewed by Detective B, an interview lasting just over thirty minutes and preceded by Article 31, UCMJ, rights warnings. Appellant was not, however, given any cleansing warning, nor was he advised that Investigator E's promises from the day prior were no longer in play. Similarly, appellant was not advised that anything he said to Investigator E the day prior could not be used against him. Unlike Investigator E, Detective B did not promise appellant anything. In fact, just over seventeen minutes into the interview, the discussion focused on an alleged statement by one of the victims, SPC KS, to appellant where SPC KS allegedly told appellant that he would "block" charges if he got his property back. Hearing this, Detective B asked appellant if he assumed charges would be blocked if the property was returned. Appellant negatively responded because he was "guilty for going into those rooms."

As the interview progressed, appellant's story changed from simply holding property for Carlos to himself burglarizing the rooms and stealing the property with Carlos, the ultimate goal being the sale of the stolen property.

Seven minutes after admitting guilt for "going into those rooms," Investigator E entered the interview room, again making promises of no prosecution. This time, Investigator E promised not to prosecute whoever was currently holding the property for appellant. Subsequently, the focus of the discussions was the immediate retrieval of the stolen property.

After obtaining appellant's confession to the burglary and larcenies and clarifying Carlos' actual existence and limited role in the crimes, both Investigator E and Detective B left appellant in the interview room, where appellant received a call from an unidentified party. During this call, a conversation that was partially recorded, appellant advised the caller that he needed the property he took returned as soon as possible. Most notably, appellant advised the unidentified party: "they said the [sh--] was - - if the [sh--] pops back up - - they said the [sh--] pops back up they gonna drop all the damn charges . . . ." Shortly thereafter, the property was returned to appellant's apartment, where it was identified by the victims as their stolen property and thereafter returned to them.

5

*Pretrial Litigation*

On the morning of trial, 17 May 2012, trial defense counsel brought a written suppression motion, seeking to exclude all of appellant's statements, alleging the statements were involuntarily obtained in violation of Article 31, UCMJ, the Fifth Amendment to the Constitution of the United States, and Military Rule of Evidence [hereinafter "Mil. R. Evid."] 305 as well as being obtained by "unlawful influence and unlawful inducement." The essence of appellant's pretrial motion was that the actions of Investigator E on 10-11 December 2011 unlawfully induced and influenced appellant into providing the first statement. Regarding the second statement to Detective B, appellant's motion noted: "[i]t was only after the promises made by INV [E] that [appellant] provided these inculpatory statements to Mrs. [B]." The defense's motion concluded with the following:

> [T]he only reason that PV1 Chatman gave the two statements is because he was induced into believing that he would not get in trouble, and that INV [E] and Mrs. [B] would help him. Therefore, like Churnovic, PV1 Chatman's statements should be suppressed because they are proscribed by M.R.E. 304(c)(3) and inadmissible.

Due to the appellant's last-minute motion, the government did not respond in writing. Rather than delay the proceeding, the military judge entertained the motion and proceeded with the trial, noting:

> Counsel came in this morning and advised me that the defense counsel has a motion to suppress statements which they just raised. The motion is Appellate Exhibit I, dated today, 17 May 2012. We have discussed it briefly in chambers this morning. And as I understand, it centers around an interview of the accused by military police investigators. Is that correct?

After receiving an affirmative response from the defense counsel, the military judge attempted to highlight the issue: "And the issue is whether – if I understand your motion Captain [H], essentially, what you are saying is the accused was led to believe that he was being offered immunity for his statement." The defense counsel responded: "Yes, ma'am. Specifically, that he would not be prosecuted for these suspected offenses [ ]."

Neither side called any witnesses and the only evidence offered and considered by the military judge was the two videotaped interviews. The session and discussions focused primarily, if not exclusively, on whether appellant was granted immunity from prosecution by Investigator E and the impact of said immunity on the government's prosecution. Although appellant's written motion

focused on voluntariness, the military judge never mentioned voluntariness during the session or ruling.

Review of the time designations in the authenticated record reveals the court recessed at 1325, 17 May 2012 and reconvened at 1455, one and a half hours later. Of note, the recess period was insufficient in length to allow the military judge to review the entirety of both videotaped interviews, which totaled over two hours and 15 minutes in duration and the session fails to reveal that the military judge conducted a complete review of both videotaped interviews. Rather, during the session, counsel referred to portions of the interview deemed relevant.

At approximately 1455, the military judge issued an oral ruling denying the defense's motion. The military judge found, in part, that "[appellant] was promised immunity for the charge of possession of stolen property in exchange for providing information on the actual culprit."[4] The military judge's oral ruling provides no conclusions of law and fails to cite what, if any, legal authority was relied upon to reach the decision.[5]

*Government's Case-in-Chief*

During its case-in-chief, the government introduced, *inter alia*, both of appellant's videotaped interviews at MPI as well as testimony from two of the three burglary victims. At the close of evidence, the military judge found appellant guilty of all charges and specifications as charged with the exception of one of the larceny charges, which she excepted from the specification an item of property allegedly stolen and reduced the charged value of the larceny from "more than $500" to "some value."

## LAW AND DISCUSSION

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006); *United States v. Whigham*, 72 M.J. 653, 658 (Army Ct. Crim. App. 2013). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citing *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)). "'Abuse of discretion' is a term of art applied to appellate review of the discretionary judgments

---

[4] Appellant was never charged with "possession of stolen property."

[5] The military judge's oral findings are not later supplemented with written findings of fact or conclusions of law.

of a trial court. An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007)).

Except in limited circumstances, "an involuntary statement or any derivative evidence therefrom may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress or an objection to the evidence under this rule."[6] Mil. R. Evid. 304(a). In this regard, a statement is involuntary "if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(c)(3). "No statement obtained from any person in violation of [Article 31, UCMJ], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." UCMJ art. 31(d). Once a motion to suppress is brought, the burden is on the government to establish the admissibility of the offered statements.

---

[6] Mil. R. Evid. 304 provides for three limited exceptions:

> (1) Where the statement is involuntary only in terms of noncompliance with the requirements of Mil. R. Evid. 305(c) or 305(f), or the requirements concerning counsel under Mil. R. Evid. 305(d), 305(e), and 305(g), this rule does not prohibit use of the statement to impeach by contradiction the in-court testimony of the accused or the use of such statement in a later prosecution against the accused for perjury, false swearing, or the making of a false official statement.

> (2) Evidence that was obtained as a result of an involuntary statement may be used when the evidence would have been obtained even if the involuntary statement had not been made.

> (3) Derivative evidence. Evidence that is challenged under this rule as derivative evidence may be admitted against the accused if the military judge finds by a preponderance of the evidence that the statement was made voluntarily, that the evidence was not obtained by use of the statement, or that the evidence would have been obtained even if the statement had not been made.

Mil. R. Evid. 304(b).

> When an appropriate motion or objection has been made by the defense under this rule, the prosecution has the burden of establishing the admissibility of the evidence. . . . The military judge must find by a preponderance of the evidence that a statement by the accused was made voluntarily before it may be received into evidence.

Mil. R. Evid. 304(e)(1); s*ee also United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F 1996). Conclusions regarding voluntariness are reviewed de novo. *Bubonics*, 45 M.J. at 95 (citing *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991)).

The lawfulness of a confession is determined upon examination of "the totality of the surrounding circumstances."[7] *Freeman*, 65 M.J. 451, 453 (citing *Bubonics*, 45 M.J. at 95). "Before *Fulminante*, a confession ''obtained by any direct or implied promises, however slight,'' was not voluntary." *Freeman*, 65 M.J. at 455 (citation omitted). "Since *Fulminante*, however, promises are considered only a factor in the equation; they are not of themselves determinative of involuntariness." *Id*. (citations omitted). "Similarly, lies, threats, or inducements are not determinative either." *Id*. (citations omitted).

If this court finds the military judge abused her discretion by admitting an involuntary confession, the conviction must be set aside "unless we determine the error in admitting the confession was harmless beyond a reasonable doubt." *Freeman*, 65 M.J. at 453 (citing *Fulminante*, 499 U.S. at 285). When deciding whether the military judge abused her discretion, the judge's ruling is afforded deference on appeal "only when the military judge indicates on the record an accurate understanding of the law and its application to the relevant facts." *United States v. Briggs*, 64 M.J. 285, 287 (citing *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002)).

The military judge's handling of the defense's 17 May 2012 motion, albeit last minute and handled without the benefit of written response, leads the court to conclude that it should be accorded no deference. As previously noted, notwithstanding a written suppression motion based on the involuntary nature of

---

[7] Consideration of the "totality of the surrounding circumstances" focuses on "both the characteristics of the accused and the details of the interrogation." *Freeman*, 65 M.J. at 453. A non-exclusive list of factors includes: the youth of the accused, his lack of education, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)) (internal citations omitted).

appellant's statement, the entirety of the pretrial motion session focused on "immunity" and was devoid of any discussion regarding the voluntariness of appellant's 10-11 December 2011 statements to Investigator E. As a result, the military judge's factual findings are limited to immunity and silent with respect to voluntariness. Some of the blame for this lack of focus rests with the defense by responding in the affirmative when the military judge asked "what you are saying is the accused was led to believe that he was being offered immunity for his statement?" However, the military judge is not without fault. Before the court was App. Ex. I, a written motion that focused the issue on the voluntariness of appellant's statements. At a minimum, the military judge should have sought clarification regarding the potential issues before her and resolved any inconsistencies between the written pleadings submitted by the trial defense counsel and counsel's in-court response to her query. That the military judge may have been urged to address "immunity" to the exclusion of "voluntariness" by appellant's counsel's query response does not relieve her of her obligation to fully address and resolve the motion before her, something she failed to do with regard to App. Ex. I.

Additionally, although limited factual findings were entered prior to her ruling, those findings focus on the issue of immunity, not voluntariness. Furthermore, the military judge failed to make any conclusions of law whatsoever which might inform this court regarding her decision. It is problematic that the military judge did not address whether appellant's statements were involuntary – that is, unlawfully induced or unlawfully influenced. As noted above, the military judge found that Investigator E made a limited promise of immunity. The problem is that even limited promises of immunity can render a confession to other crimes involuntary. *See United States v. Churnovic*, 22 M.J. 401, 408 (C.M.A. 1986) ("Indeed, use of such a promise to obtain a statement but not honoring that promise constitutes an 'unlawful inducement' for purposes of Article 31(d), [UCMJ]."). In this case, the issues of promised immunity and voluntariness are so intertwined as to be inseparable.

*Interview #1*

Turning to the first videotaped interview, the issue is whether Investigator E's statements unlawfully induced or influenced appellant's statement. As noted in the background section, Investigator E made promises to appellant and created, at a minimum, the appearance that Investigator E was speaking with the authority of the prosecutor and arguably the garrison commander.

Almost immediately after advising appellant of his Article 31, UCMJ, rights, Investigator E told appellant "I have a real big influence with the prosecutor as far as what happens to subjects." Investigator E then discussed how appellant would not be charged for possessing stolen property, telling appellant "if you lead the

prosecutor to who really did this . . . they're not gonna charge you for that - - that's piddly [sh--]," a statement the Military Judge found to be the equivalent of promised immunity from prosecution for possessing stolen property.[8]

When Investigator E did not get what he wanted from appellant, Investigator E told appellant that JAG, not MPI, was charging him and the paperwork was "already in." Investigator E immediately followed this statement with, "I just talked with the prosecutor and there is [sh--] we can do to help you out." The offer of help was contingent upon appellant giving MPI some facts and cooperating with MPI. Investigator E told appellant, "[y]ou're gonna have to start giving me some fact (sic) man . . . . I just called the prosecutor at 12:30 at night, told him a little about the situation." Investigator E added, "[t]he prosecutor has already said man that he's willing - - you know, we're - - they're willing to work - - to work [sh--] out - - if you're legitimately honest and you know, you - - you just want to get out of this [sh--], I mean, we can work with you."

Investigator E's efforts to obtain "fact[s]" from appellant were eventually answered when appellant brought Carlos into the story, laying blame for the burglaries and larcenies at Carlos' feet. Having gotten facts as requested, Investigator E then advised that appellant was not being charged, specifically telling him "I'm not gonna charge you" and appellant was "gonna walk tonight." There were, however, some conditions in place: appellant would have to "cooperate" with MPI; "[b]e loyal to [Investigator E]; help [ ] out with [the] investigation;" and refrain from talking to anybody about the investigation. Investigator E characterized the exchanged information "protected information," information accessible to Investigator E, Investigator E's Lieutenant, and the prosecutor only.

By the close of the interview, appellant went from being the person Investigator E was "trying to get" to being on his "side." After telling appellant that they were now teammates, for lack of a better term, Investigator E again advised appellant that he was not being charged, telling him: "I told you I was gonna work with you. I aint [bullsh---ing] you because you aint getting charged." Finally, Investigator E told appellant that MPI reports directly to the garrison commander, assuring appellant that "whatever we need to do to help you out, as long as you help us out, it can get done."

---

[8] We need not address and do not reach the issue of whether appellant was granted actual or de facto immunity from prosecution as a result of Investigator E's comments. Our decision in this case rests on the voluntariness of appellant's statements to Investigator E and its impact on the statements made the following day to Detective B. In other words, we need not and do not decide the validity of the Military Judge's ruling finding a limited grant of immunity from prosecution for possessing stolen property, an offense for which appellant was never charged.

Investigator E's promises and statements to appellant on 10-11 December 2011 equaled or exceeded in scope those comments held by our superior court to rise to the level of unlawful inducement in *United States v. Churnovic*. 22 M.J. 401 (C.M.A. 1986). In *Churnovic*, Petty Officer (PO) Churnovic told his supervisor, Chief Petty Officer E, where hashish was hidden aboard the USS OUELLET. 22 M.J. at 403. This disclosure was made following a promise from the Chief Petty Officer that whoever turned in the contraband "wouldn't get in trouble." *Id*. Petty Officer Churnovic later confessed to Naval Investigative Service Special Agent Waddell that he used hashish at substantially the same time. *Id*. Thereafter, however, appellant was charged with, *inter alia*, wrongful possession and wrongful use of hashish. *Id*. at 402. Petty Officer Churnovic's pretrial motion to dismiss based on a "grant of immunity" as well as the absence of Article 31, UCMJ, warnings were denied by the trial judge and he was eventually convicted of both possessing and using hashish. *Id*. at 405.

In setting aside PO Churnovic's conviction, the court found the statements at issue, such as the location of the hashish, were unlawfully induced by the promise made to PO Churnovic.[9] The court also found that the hashish itself was "derivative" evidence of the Article 31(d), UCMJ, violation. *Id*. at 408. The court specifically noted, "use of such a promise to obtain a statement but not honoring that promise constitutes an 'unlawful inducement' for purposes of Article 31(d)." *Id*. Regarding PO Churnovic's confession regarding his use of hashish to Naval Investigative Service Special Agent Waddell made two days after disclosure of the hashish's location, the court noted:

> [I]t is clear that here the original unwarned statements to [Chief Petty Officer E] directly produced the later statements to Waddell. The relationship in time and place is too close to allow reception of the later statement. Clearly the later statement would not have been made if earlier Churnovic had not made his inadmissible statement to [Chief Petty Officer E] disclosing the exact location of the hashish.

*Id*.

In *United States v. Kimble*, Air Force Technical Sergeant Kimble was tried and convicted for committing indecent acts on his younger daughter. 33 M.J. 284,

---

[9] However, the court also noted that "even if the claim of transactional immunity were upheld, it would not dispose of the offenses of use for which Churnovic was convicted." 22 M.J. at 407.

284 (C.M.A. 1991).  As part of a civilian pretrial diversionary program, Technical Sergeant Kimble was enrolled in a downtown treatment program.  Technical Sergeant Kimble's squadron commander advised appellant that the Special Court-Martial Convening Authority decided that successful completion of the treatment program would prevent any court-martial action.  *Id*. at 285-86.  Notwithstanding the promise, appellant was tried at a general court-martial where the government introduced the testimony of a clinical therapist to whom appellant made inculpatory statements as part of the treatment program.  The statements were the subject of an unsuccessful defense suppression motion alleging that appellant was granted immunity from prosecution and that the statements were unlawfully induced or influenced by the no-prosecution promise, both of which arguments were rejected by the trial judge.  *Id*. at 288-89.  The court of military review affirmed.  30 M.J. 892 (A.F.C.M.R. 1990).  The Court of Military Appeals, however, disagreed.

On appeal before the Court of Military Appeals, the government focused on Technical Sergeant Kimble's alleged deception by not advising the command of the full scope and extent of his daughter's abuse.  That is, the chain of command was led to believe appellant abused his daughter on two occasions and only after they discovered the full extent of his abuse during appellant's treatment did they decide to prosecute appellant.  In other words, had the abuse been limited as initially believed, appellant would not have been prosecuted.  The court found this argument unpersuasive, noting: "If the Government relied solely on appellant's version of events in making its decision and its subsequent promise—without any expression of a caveat that that version must have been accurate and complete—the Government proceeded at its own risk."  *Kimble*, 33 M.J. at 290.  Furthermore, "the failure of Air Force officials to be 'knowledgeable' in making their promise was due to their own inattention and lack of even rudimentary investigation, not to appellant's deception."  *Id*. at 291.  Lastly, the court referred back to its admonishment in *Churnovic*:  "Care should be taken in making promises of immunity; . . . However, once made, the promise should be complied with by the Government rather than evaded on technical grounds."  *Id*. at 293 (quoting *Churnovic*, 22 M.J. at 407).

The court concluded:

> Fundamentally, however, what military officials at all levels must keep in mind is this:  Regardless whether the promise be one formally of immunity pursuant to RCM 704, or whether it be one that induces the accused into making incriminating admissions as in *Churnovic*, or whether it is one that in some other way is relied upon by an accused to his detriment, due process requires that the accused get the benefit of his bargain.

*Id*. at 293 (citation omitted).  Judge Cox, while dissenting from the majority opinion's finding of immunity, noted he would "strike all evidence from the record

which was or could have been derived from [ ] when the decision was communicated to appellant that the case would be handled by civilian agencies." Judge Cox concluded:

> There is no question in my mind that appellant had a right to rely upon his commanding officer's representation that the matter would not result in court-martial if he cooperated with the civil authorities. I would not elevate this promise to a grant of immunity, but I would find that it constituted a form of legal coercion under Article 31.
>
> Accordingly, I dissent from the majority opinion, but I do so recognizing that the end result might well be the same.

*Id*. at 294; *see also Cunnigham v. Gilevich*, 36 M.J. 94, 101 (C.M.A. 1992) (repeated conversations and advice by command to accuseds (i.e., petitioners) advising them that they should testify before board investigating training accident and it would all "work out" did not rise to level of promised immunity but did "[influence] the advice given by petitioners' counsel" overcoming their reluctance to testify and constituted "'unlawful influence' within the meaning of Article 31(d) [UCMJ];" statements held inadmissible).

In less than two hours with appellant, Investigator E noted: his significant influence with the prosecutor; that appellant would not be prosecuted for possessing stolen property; that Investigator E personally spoke with the prosecutor at "12:30" (0030); that Investigator E and the prosecutor were willing to work with appellant; and that appellant, once he provided "fact[s]," which he did, would not be charged. Although Investigator E asked appellant to be honest, the statement that appellant would not be charged was not contingent upon a complete, honest, and full accounting of appellant's role in the crimes. In fact, the statement regarding no charges, if contingent upon anything, was contingent upon appellant "cooperating" with MPI, being "loyal" to Investigator E, and refraining from talking to anybody other than MPI. The statement by Investigator E that appellant was not being charged was made not once, but twice. Perhaps in an effort to enhance credibility or apparent authority, Investigator E ended the interview by highlighting MPI's relationship with "the garrison commander," noting "whatever we need to do to help you out, as long as you help us out, it can get done."

Although appellant's lack of forthrightness with Investigator E regarding his full involvement in the burglaries and larcenies is a factor considered by this court in reaching its decision, it is not dispositive of whether Investigator E improperly induced or influenced appellant to make his 10-11 December 2011 statement. We reiterate the sage advice provided by our higher court in *Kimble* over twenty years ago: "If the Government relied solely on appellant's version of events in making its decision and its subsequent promise—without any expression of a caveat that that

version must have been accurate and complete—the Government proceeded at its own risk." *Kimble*, 33 M.J. at 290. Stated another way, "Care should be taken in making promises." *Id*. at 293 (quoting *Churnovic*, 22 M.J. at 407).

When considering the "totality of the surrounding circumstances," we find Investigator E's statements collectively constitute unlawful inducement or unlawful influence resulting in an involuntary confession under Mil. R. Evid. 304(c)(3) and one obtained in violation of Article 31(d), UCMJ. Thus, the military judge erred in denying the defense's suppression motion and in admitting the 10-11 December 2011 videotaped interview as captured collectively in Pros. Ex. 1A and 1B.

*Interview #2*

We now address appellant's 12 December 2011 interview by Detective B, one unencumbered by promises and references to the prosecutor and garrison commander. The question before us, considering our suppression of the first interview, is what impact, if any, did appellant's first confession have on his second? In other words, is the second confession "fruit of the poisonous tree" or derivative of the first. *United States v. Conklin,* 63 M.J. 333, 334 (C.A.A.F.2006) (citing *Nardone v. United States,* 308 U.S. 338, 341 (1939)). If so, the evidence is inadmissible. *Id*. However, if the government can establish that the second confession was "an independent act of free will," the confession would be admissible. *Conklin*, 63 M.J. at 338.

In *Wong Sun v. United States,* 371 U.S. 471 (1963), the Supreme Court noted,

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407 (internal citations and quotation marks omitted). To make this determination, we consider three factors: "temporal proximity of the [violation] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *see Conklin,* 63 M.J. at 338.

As previously noted, the session in appellant's case was limited exclusively to the issue of immunity. As such, the session failed to develop any evidence

regarding the facts and circumstances surrounding appellant's second interview. What can be gleaned from review of Pros. Ex. 2 and the record reveals an interview that occurred within approximately thirty-six hours of appellant's first interview. Although appellant was advised of his Article 31, UCMJ, rights, no cleansing warnings were given nor were any of the promises previously made by Investigator E discussed. The only discussion arguably related to immunity or no prosecution focused on a statement one victim made to appellant indicating he would "block" charges if he, the victim, received his property back. When asked by Detective B if appellant thought charges would be "blocked," appellant responded he did not, because he was "guilty for going into those rooms." As for appellant's return to MPI for a supplemental interview, the record fails to reveal whether appellant returned of his own accord without prompting or whether he was brought in for additional questioning. Whether appellant had access to defense counsel or sought the advice of counsel, military or civilian, is likewise unaddressed.[10] What is without dispute, however, is that appellant was told by Investigator E he could not talk to anyone except members of MPI or the prosecutor.

Applying the *Brown* factors, all three cut against the government. First, temporal proximity, favors appellant when considering 10-12 December 2011 was a weekend period and appellant was advised by Investigator E that he could not talk to anyone about the case. The government failed to introduce any evidence that appellant did anything except sit around and wait to be re-interviewed by law enforcement in accordance with Investigator E's' specific guidance. Second, intervening circumstances also favor appellant even when considering that appellant was properly advised of his Article 31, UCMJ, rights before the second interview. This advice is, however, viewed against a backdrop where appellant was not given a cleansing warning and not advised that Investigator E was acting well beyond his authority in advising appellant that he was no longer a subject, not being charged, and now a part of Investigator E's team. Finally, the purpose and flagrancy of the official misconduct favors appellant for the reasons noted in our discussion of the first interview.

Furthermore, the facts and analysis of *Churnovic* are useful in analyzing appellant's second interview. The grant of immunity in *Churnovic*, even if established, would not have covered every crime of which PO Churnovic was convicted. 22 M.J. at 407. However, the initial unlawful inducement in *Churnovic* "directly produced" the later statements. *Id.* at 408. Here, the military judge found a limited grant of immunity that did not cover the crimes of which appellant was convicted. But, similar to *Churnovic*, "it is clear that here the original [ ] statements

---

[10] The court takes judicial notice of the fact that 10-12 December 2011 was a Saturday through Monday.

[ ] directly produced the later statements [ ]. The relationship in time and place is too close to allow reception of the later statement." *Churnovic*, 22 M.J. at 405. Given the absence of evidence to the contrary in the record, appellant's second videotaped interview with Detective B is derivative of his first unlawful interview and not sufficiently attenuated so as to allow its admission. As such, the military judge erred in denying the defense's suppression motion and in admitting the 12 December 2011 videotaped interview as captured in Pros. Ex. 2.

## CONCLUSION

We find, for the reasons noted *supra*, that the military judge abused her discretion in admitting appellant's 10-11 December 2011 statements to Investigator E as documented collectively in Pros. Ex. 1A and 1B, appellant's first videotaped interview. After considering the totality of the circumstances surrounding the taking of appellant's initial videotaped interview, we find the statements were the result of unlawful inducement or influence. We further find that the government has failed to establish that the second videotaped interview with Detective B, Pros. Ex. 2, was not derivative of the first and as such, is likewise inadmissible against appellant. Finally, we find that admission of Pros. Ex. 1A, 1B, and 2 was not harmless beyond a reasonable doubt.

The findings of guilty and the sentence are set aside. The charges are dismissed. All rights, privileges, and property, of which appellant has been deprived by virtue of this decision setting aside the findings and sentence are ordered restored. *See* UCMJ arts. 58a(b), 58b(c), and 75(a).

Judge ALDYKIEWICZ and Judge MARTIN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court