UNITED STATES, Appellee

v.

Ryan G. ANDERSON, Specialist
U.S. Army, Appellant

No. 08-0344

Crim. App. No. 20040897

United States Court of Appeals for the Armed Forces

Argued September 22, 2009

Decided March 4, 2010

RYAN, J., delivered the opinion of the Court, in which EFFRON,
C.J., and BAKER, ERDMANN, and STUCKY, JJ., joined.


Counsel


For Appellant:  Eugene R. Fidell, Esq. (argued); Lieutenant
Colonel Matthew M. Miller, Captain Candace N. White Halverson,
and Matthew S. Freedus, Esq. (on brief); Lieutenant Colonel
Steven C. Henricks, Major Grace M. Gallagher, Captain Jason Nef,
and Brent C. Harvey, Esq.


For Appellee:  Captain Stephanie R. Cooper (argued); Colonel F.
J. Allen III, Lieutenant Colonel Martha L. Foss, and Major Lisa
L. Gumbs (on brief); Major Elizabeth G. Marotta, Major Tami L.
Dillahunt, Captain W. Todd Kuchenthal, and Captain Philip M.
Staten.


Military Judge:  Debra L. Boudreau


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge RYAN delivered the opinion of the Court.

This case presents two questions: (1) whether Appellant's trial became fundamentally unfair where, after the military judge denied Appellant's request for a forensic psychologist expert witness, the Government presented such a witness during its rebuttal case; and (2) whether the military judge erred in failing to dismiss charges under Articles 80, 104, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 904, 934 (2000), because the charges were based on a single transmission of information to those Appellant believed to be the enemy.[1] We first hold that we are convinced beyond a reasonable doubt that the testimony of the Government's witness on rebuttal did not prejudice Appellant. Second, we hold that the challenged charges are not multiplictious, an unreasonable multiplication of charges, or preempted. We therefore affirm the decision of the lower court.

---

[1] Upon Appellant's petition, we granted review of the following issues:

I. SHOULD THE MILITARY JUDGE HAVE DISMISSED CHARGE III AS PREEMPTED, MULTIPLICIOUS, AND AN UNREASONABLE MULTIPLICATION OF CHARGES; AND THE ADDITIONAL CHARGE AS MULTIPLICIOUS WITH CHARGE I, SPECIFICATION 1, AND AN UNREASONABLE MULTIPLICATION OF CHARGES WITH CHARGE I, SPECIFICATION 2?

II. WAS APPELLANT AFFORDED A FAIR TRIAL EVEN THOUGH HIS REQUEST FOR A FORENSIC PSYCHIATRIST WAS DENIED AND THE GOVERNMENT THEREAFTER AVAILED ITSELF OF A FORENSIC PSYCHIATRIST AND ATTACKED THE QUALIFICATIONS OF THE VERY EXPERT IT DID MAKE AVAILABLE TO THE DEFENSE?

## I.  Facts

A general court-martial convicted Appellant, contrary to his pleas, of one specification of attempting to give intelligence to the enemy, two specifications of attempting to communicate with the enemy, one specification of attempting to aid the enemy, and one specification of wrongfully and dishonorably providing information to military personnel whom he believed were terrorists, which was conduct prejudicial to good order and discipline and of a nature to bring discredit upon the armed forces, in violation of Articles 80, 104, and 134, UCMJ. Appellant was sentenced to confinement for life with eligibility for parole and a dishonorable discharge.  The sentence was approved by the convening authority and the United States Army Court of Criminal Appeals (CCA) affirmed in a per curiam opinion.  United States v. Anderson, No. Army 20040897 (A. Ct. Crim. App. Jan. 31, 2008).

The charges stem from actions that occurred before Appellant deployed with his Washington State National Guard unit to Iraq in the fall of 2004.  Appellant began posting comments and pictures on a website called "Brave Muslims."  On October 6, 2003, Appellant posted a comment stating, "Soon, very soon, I will have an oppertunity [sic] to take my own end of the struggle against those who would oppress us, to the next level. Inshallah I shall be closer to some of you, and can enlist your

3

aid upon my arrival." He further requested that any "Brave Muslims" should contact him to start a dialogue and posted a picture of himself dressed in traditional Arab garb while brandishing a weapon. This website also contained numerous pictures of U.S. and coalition soldiers in a file entitled "enimies" [sic].

Through the website, Appellant began exchanging e-mails with a purported Muslim extremist in order to offer his aid towards extremist goals. On November 2, 2003, Appellant authored an e-mail in which he wrote, "Just curious, would there be any chance a brother who might be on the wrong side at the present, could join up . . . defect so to speak?" Subsequent e-mails on November 3, 7, and 9, 2003, detail the possible movements of Appellant's unit to Iraq, the units that his unit would be replacing, and ways in which Appellant could be contacted that would hinder any investigation into the conversations. In reality, the "Muslim extremist" was a private American citizen who was a member of a group of concerned citizens devoted to gathering intelligence in an attempt to thwart terrorist activities in the United States.

As Appellant became more comfortable with his "extremist" contact, his e-mails became much more detailed and included comprehensive information about the number of soldiers in his unit, their training programs, and the precise location to which

his unit would be deploying.  This included:  (1) e-mails on November 11, 2003, that detailed how soldiers were being trained to spot potential suicide bombers; and (2) an e-mail on December 14, 2003, that detailed the location of his unit's planned deployment to Balad, Iraq, estimated the number and capabilities of the soldiers that would be stationed there, and expressed a desire to "bring [him]self . . . across to the arms of our Muslim brothers and sisters when I come to Iraq."  The conversations between Appellant and the "extremist" culminated in several e-mails during December 2003 and January 2004 in which they coordinated a meeting to plan for actions against U.S. interests within the United States.  However, no meeting took place because Appellant was deployed overseas before any definite plans were established.

On November 10, 2003, the civilian who had been posing as an extremist reported Appellant's actions to the Federal Bureau of Investigation (FBI).  This led FBI agents and military personnel to open an official investigation, begin posing as Al Qaeda operatives, and initiate communications with Appellant via a telephone number he had provided to the civilian.  These communications began on or about January 17, 2004, and focused on determining Appellant's intentions and the viability of a face-to-face meeting.  Appellant eventually met with undercover investigators on February 8, 2004, and provided a floppy disk

with his passport picture to prove his identity.  A second
meeting occurred the following day, February 9, 2004, during
which Appellant provided the undercover agents with computer
diskettes containing classified information on the
vulnerabilities of various military vehicles, the
vulnerabilities of his unit as they traveled to Iraq, and other
sensitive information.  Appellant also noted the most vulnerable
points of several Army vehicles -- including M1A1 and M1A2 tanks
-- on paper schematics he had brought with him, and he verbally
described the most effective way to force a tank crew to abandon
their vehicle and kill them.  Shortly after the second meeting
occurred, Appellant was taken into custody.

Prior to trial, Appellant was evaluated by a board convened
pursuant to Rule for Courts-Martial (R.C.M.) 706 to determine
his mental responsibility.  The board diagnosed Appellant with
Attention Deficit Disorder and an unspecified personality
disorder but determined that Appellant had no severe mental
disease or defect, appreciated the nature and quality of the
wrongfulness of his conduct, and was able to understand the
nature of the proceedings against him.  Subsequently, Appellant
requested that the court detail a civilian clinical and forensic
psychologist, Dr. Reneau Kennedy, located in Honolulu, Hawaii,[2]

---

[2] Appellant was held, and the trial took place at Fort Lewis,
Washington.  Defense counsel estimated that the assistance of

to assist the defense in trial preparation and as a potential expert witness at trial.  The convening authority denied the request.  The request was renewed before the military judge, who found:

> The diagnosis alone and a RCM 706 board does not indicate in any way that the accused lacks mental capacity or is unable to form the specific intent required.  There is no underlying factual basis and no showing of anything that would satisfy the requirements for employing an expert . . . . I will revisit this later if there is evidence that would support the defense allegations, but the mere nature of the offenses and the type of diagnosis alone do not mandate that the government provide expert assistance.

After this ruling, the defense requested and was granted the assistance of a government-appointed expert in clinical psychology, Dr. Jack T. Norris.  The military judge denied a Government motion in limine concerning whether Dr. Norris would be allowed to provide testimony as to the intent or knowledge of the accused, holding that the Government was incorrect in asserting that it takes a forensic psychologist to testify to such matters.  The military judge also denied Appellant's request that the Government be prevented from attacking Dr. Norris's credentials, holding that such cross-examination would be relevant if Dr. Norris strayed beyond the bounds of his expertise.

---

Dr. Kennedy would have cost the Government approximately $10,000, while the Government's estimate was $20,000.

At trial, Dr. Norris testified that he diagnosed Appellant with Bipolar I Disorder, schizotypal and narcissistic features, and an unspecified personality disorder, but that none of the conditions prevented Appellant from knowing the difference between role-playing and reality or from separating fact from fiction. The Government's cross-examination of Dr. Norris was quite limited. While the Government did draw attention to the fact that he was a clinical and not a forensic psychologist -- and therefore not an expert in the interface between the law and psychology -- neither the accuracy of Dr. Norris's psychological evaluation nor his qualification to make such an evaluation was called into question. Appellant also presented testimony from another expert, Dr. Russell Hicks, a staff psychiatrist at the Madigan Army Medical Center and Appellant's treating psychiatrist, who testified that he had diagnosed Appellant with Asperger's Syndrome and Bioplar I Disorder, which inhibited Appellant's ability to interact with others but did not affect his knowledge of the difference between right and wrong. Dr. Hicks based his opinion mainly on his observation of Appellant while in confinement and historical evidence of Appellant's behavior, and stated that he did not find evidence contemporaneous to the crime helpful. On cross-examination, Dr. Hicks admitted that, while a practicing psychiatrist, he was not

8

board-certified and did not view himself as an expert on Asperger's Syndrome.

In rebuttal, the Government called Dr. Ricky Malone, a forensic psychiatrist from Walter Reed Army Medical Center. No objection was made to Dr. Malone's qualifications or testimony. Dr. Malone noted that there was legitimate diagnostic uncertainty with respect to this case and that the assessments made by Dr. Norris and Dr. Hicks were "all reasonable considerations." In agreement with the defense witnesses, Dr. Malone testified that Appellant's psychological symptoms affected neither his intellectual functioning nor his ability to tell the difference between right and wrong. Dr. Malone did raise an issue regarding Dr. Hicks's (Appellant's treating psychiatrist) testimony about the material that Dr. Hicks took into account when coming to his diagnosis. Dr. Malone testified that in the field of forensic psychology, contemporaneous evidence of Appellant's behavior should be given great weight in the diagnosis. Furthermore, Dr. Malone testified that, contrary to Dr. Hicks's testimony, Asperger's Syndrome does not affect cognitive functioning. Dr. Malone did agree that Dr. Hicks's testimony was correct in regards to the disease's affect on social interaction and social reciprocity. Dr. Malone did not comment on any of the assertions made by Dr. Norris, the clinical psychologist appointed to assist the defense.

II.  Denial of Forensic Psychologist

Servicemembers are entitled to government-provided expert assistance if such assistance is necessary to their defense. United States v. Freeman, 65 M.J. 451, 458 (C.A.A.F. 2008).  The government must provide the expert if the accused establishes:

> that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial.  To establish the first prong, the accused "must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop."

Id. (citations omitted).  When the defense requests a nonmilitary expert, the defense must provide an estimated cost of employment and illustrate why a military expert would be an inadequate substitute.  While the military judge is not required to provide the particular expert requested, if the defense shows that expert assistance is necessary an adequate substitute must be provided.  United States v. Warner, 62 M.J. 114, 118 (C.A.A.F. 2005).  A military judge's ruling regarding the appointment of a government-funded expert is reviewed for an abuse of discretion and will only be overturned if the findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law.  See United States v. Lee, 64 M.J. 213, 217 (C.A.A.F. 2006) (citing United States v. Gunkle, 55 M.J. 26, 32 (C.A.A.F. 2001)).

The decision to deny Appellant's request for the expert assistance of Dr. Kennedy was not an abuse of discretion in the absence of any:  (1) reason beyond a childhood diagnosis of Attention Deficit Disorder and the convening of an R.C.M. 706 board to suggest that Appellant might lack the mental capacity to form the specific intent required; or (2) assertion, after the subsequent request for the expert assistance of Dr. Norris was granted, that Dr. Norris was inadequate.  While there are three possible periods in which an abuse of discretion could have occurred (the initial denial of a forensic psychologist by the convening authority, the affirmation of that denial by the military judge, or the appointment of Dr. Norris rather than the expert Appellant originally requested), Appellant's argument is not focused on these actions.  Instead, Appellant's core argument is that his court-martial was fundamentally unfair because the military judge, having rejected Appellant's motion challenging the convening authority's denial of a government-funded forensic psychologist, failed, after the Government subsequently presented rebuttal testimony of a forensic psychiatrist, to revisit the earlier ruling or take some other action.

A trial is fundamentally unfair where the government's conduct is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes

to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32 (1973) (citation omitted). Appellant did not object to the testimony or qualifications of the Government's rebuttal expert, and we therefore review the military judge's failure to act for plain error. See United States v. Powell, 49 M.J. 460, 463-65 (C.A.A.F. 1998) (holding that failure to object at trial should cause this Court to review solely for plain error, i.e., error that is clear or obvious and materially prejudicial to an appellant's substantial rights).

As a threshold matter we note that Appellant does not argue, and it is not the law, that having expert type A for Appellant and expert type B for the Government on rebuttal is per se unfair. See Warner, 62 M.J. at 119 (requiring the defense expert to "have qualifications reasonably similar to those of the Government's"). Nor does Appellant detail how Dr. Norris was inadequate.

In any event, we need not decide an issue of first impression, whether the military judge's failure to stop the trial and appoint a forensic psychologist to Appellant because the Government had one testify on rebuttal was error, let alone plain error, because Appellant was not prejudiced by the limited rebuttal testimony of the Government's forensic psychiatrist. See Article 59, UCMJ, 10 U.S.C. § 859 (2000); United States v. Farley, 60 M.J. 492, 493 (C.A.A.F. 2005) ("We need not decide

12

whether there was error, because any error was harmless.").

Because Appellant raises a due process argument, our test for

prejudice must be whether the challenged action was harmless

beyond a reasonable doubt. United States v. Buenaventura, 45

M.J. 72, 79 (C.A.A.F. 1996); see Ake v. Oklahoma, 470 U.S. 68,

86-87 (1985) (reversing and remanding case for a new trial

because denial of expert assistance deprived defendant of due

process); United States v. Crews, 781 F.2d 826, 834 (10th Cir.

1986) (finding prejudice where expert assistance wrongfully

withheld was indispensible for a fair trial).

Dr. Malone's testimony added little to the Government's

case and bolstered the testimony of Appellant's experts. Rather

than attack the diagnoses of Appellant's experts, Dr. Malone

noted that there were legitimate reasons for the discrepancy in

diagnosis among the two defense experts and that their

conclusions were entirely reasonable. The only discrepancies

between the testimony of Dr. Malone and either defense expert

concerned the importance of certain evidence to a clinical

diagnosis and the affect of Asperger's Syndrome on cognitive

functioning, and those discrepancies were between Dr. Malone and

Appellant's treating psychiatrist, not the court-appointed

psychologist.[3] Because the Government's rebuttal expert's

---

[3] The evidence at issue was a videotape of Appellant meeting with
two undercover agents on February 9, 2004. On the tape

13

testimony merely confirmed the plausibility of Appellant's

experts' direct testimony, we are convinced beyond a reasonable

doubt that Appellant was not prejudiced by it.

### III.  Multiplicity

Appellant alleges that Charge III[4] (simple disorder in

violation of Article 134, UCMJ) is multiplicious of Charge 1,

Specifications 1[5] (attempting to knowingly give intelligence to

---

Appellant explained his intentions and personal beliefs, expressed a "considerable amount" of anti-American sentiment, and provided the undercover agents with the sensitive information at issue in this case.  Dr. Hicks, did not find the contemporaneous evidence of the crime crucial to his diagnosis, however, Dr. Malone testified that it was the best evidence on which to base a diagnosis.

[4] Charge III states:

> In that Specialist Ryan G. Anderson, also known as Amir Abdul Rashid, U.S. Army, did, on divers occasions, at or near Fort Lewis, Yakima, Lakewood, Lynnwood, and Seattle, Washington, between, on or about 17 January 2004 and about 10 February 2004, wrongfully and dishonorably provide: information on U.S. Army troop movements, equipment, tactics, identification and weapon systems; methods and means of killing U.S. Army personnel and destroying U.S. Army weapon systems and equipment; and specific vulnerabilities of U.S. Army organizations, weapon systems, and equipment, to U.S. military personnel, whom the accused thought were Tariq Hamdi and Mohammed, members of the al Qaida terrorist network, such conduct being prejudicial to good order and discipline in the armed forces, and of a nature to bring discredit upon the armed forces.

[5] Specification 1 of Charge I states:

> In that Specialist Ryan G. Anderson, also known as Amir Abdul Rashid, U.S. Army, did, on divers occasions, at or near Fort Lewis, Yakima, Lakewood, Lynnwood, and Seattle, Washington, between, on or about 23 January 2004 and about

the enemy in violation of Articles 80 and 104, UCMJ) and 2[6]

(attempting to communicate with the enemy in violation of

Articles 80 and 104, UCMJ), and that the Additional Charge[7]

---

> 10 February 2004, attempt to, without proper authority, knowingly give intelligence to the enemy, by disclosing true information to U.S. military personnel, whom the accused thought were Tariq Hamdi and Mohammed, members of the al Qaida terrorist network, an enemy force, about: U.S. Army troop movements, equipment, tactics, and weapon systems; methods and means of killing U.S. Army personnel and destroying U.S. Army weapon systems and equipment; and specific vulnerabilities of U.S. Army organizations, weapon systems, and equipment.

[6] Specification 2 of Charge I states:

> In that Specialist Ryan G. Anderson, also known as Amir Abdul Rashid, U.S. Army, did, on divers occasions, at or near Fort Lewis and Lynnwood, Washington, between, on or about 17 January 2004 and about 22 January 2004, attempt to, without proper authority, knowingly communicate with the enemy, by oral, written, and electronic communication to U.S. military personnel, whom he, the said Specialist Ryan G. Anderson, thought to be Tariq Hamdi, member of the al Qaida terrorist network, an enemy force, a communication in words substantially as follows, to wit:  I wish to meet with you; I share your cause; I wish to continue contact through conversations and personal meetings.

[7] The Additional Charge states:

> In that Specialist Ryan G. Anderson, also known as Amir Abdul Rashid, U.S. Army, did, on divers occasions, at or near Fort Lewis, Yakima, Lakewood, Lynnwood, and Seattle, Washington, between, on or about 23 January 2004 and about 10 February 2004, attempt to, without property authority, knowingly communicate with the enemy, by oral, written and electronic communication to U.S. military personnel, whom he, the said Specialist Ryan G. Anderson, thought to be Tariq Hamdi and Mohammed, members of the al Qaida terrorist network, an enemy force, a communication in words substantially as follows, to wit:  I wish to desert from the U.S. Army; I wish to defect from the United States; I

United States v. Anderson, No. 08-0344/AR

(attempting to communicate with the enemy in violation of Articles 80 and 104, UCMJ) is multiplicious of Charge 1, Specification 1 and an unreasonable multiplication of Charge 1, Specification 2.  We disagree.

We review multiplicity claims de novo.  United States v. Roderick, 62 M.J. 425, 431 (C.A.A.F. 2006).  "'If a court, contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct,' the court violates the Double Jeopardy Clause of the Constitution."  Id. (citations omitted) (emphasis in original).  This Court "analyze[s] Congress' intent using the separate elements test established in Blockburger v. United States, 284 U.S. 299 (1932)."  Id. at 432 (citations omitted).

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Blockburger, 284 U.S at 304.

A facial comparison of the elements of the charges Appellant claims are multiplictious demonstrates that each "requires proof of a fact which the other does not."  Id. Article 134, UCMJ, requires a finding that (1) the accused did or failed to do certain acts, and (2) under the circumstances,

---

wish to join al Qaida, train its members, and conduct terrorist attacks.

16

the accused's conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.  Manual for Courts-Martial, United States pt. IV, para. 60.b. (2005 ed.) (MCM).  Article 80, UCMJ, however, also requires that the "certain acts" be overt and that the act (1) was done to commit a certain offense under the code, (2) amounted to more than mere preparation, and (3) apparently tended to effect the commission of the intended offense.  MCM pt. IV, para. 4.b.  Charge III and Charge I are not multiplicious.

Nor is the Additional Charge multiplictious with Charge I, Specification 1.  While that specification concerns attempts to give intelligence to the enemy, the Additional Charge focuses on attempts to communicate with the enemy.  Congress defined aiding the enemy as giving intelligence to or communicating with the enemy.  See United States v. Dickenson, 6 C.M.A. 438, 450, 20 C.M.R. 154, 166 (1955) ("As we read Article 104, none of the acts enumerated is conditioned upon, or restricted by, another. Rather, the Article prohibits separate and distinct acts, each of which is sufficient by itself to constitute the offense."); compare MCM pt. IV, para. 28.b(4) (giving intelligence to the enemy), with MCM pt. IV, para. 28.b(5) (communicating with the enemy).  Because each charge "requires proof of a fact which the other does not," the charges are not multiplicious.

17

IV.  Unreasonable Multiplication of Charges

Even where charges are not multiplictious, "the prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard -- reasonableness -- to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system."  United States v. Quiroz, 55 M.J. 334, 338 (C.A.A.F. 2001).  Five factors should be considered when determining if multiple findings of guilt constitute an unreasonable multiplication of charges:

> (1)  Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?;
>
> (2)  Is each charge and specification aimed at distinctly separate criminal acts?;
>
> (3)  Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?;
>
> (4)  Does the number of charges and specifications unfairly increase the appellant's punitive exposure?;
>
> (5)  Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

Id. (citation and quotation marks omitted).

As we have previously held, the application of the Quiroz factors involves a reasonableness determination, much like sentence appropriateness, and is a matter well within the discretion of the CCA in the exercise of its Article 66(c),

UCMJ, 10 U.S.C. § 866 (2000), powers.  Id. at 339; see United States v. Sales, 22 M.J. 305, 307-08 (C.M.A. 1986); United States v. Suzuki, 20 M.J. 248, 249 (C.M.A. 1985).  In this case, the issue of unreasonable multiplication of charges was raised to the CCA, affording the lower court the opportunity to award relief on this issue.  No relief was awarded.

We do not find that the CCA abused its discretion in declining to find an abuse of prosecutorial discretion here. Appellant completed any number of independent actions that alone would have been sufficient to support specifications in addition to the ones with which he was charged.  While Appellant did object at trial, his criminality was not exaggerated by the manner in which the conduct was charged; his punitive exposure was not increased, because a conviction on any one of the Articles 80, UCMJ, offenses had a maximum punishment of life confinement; and the Government could easily have broken up the specifications as drafted into multiple different specifications based on specific contacts, e-mails, Internet postings, etc. While we do not have the benefit of the CCA's reasoning because its disposition was summary, we presume that it undertook the correct analyses, cf. United States v. Robbins, 52 M.J. 455, 457 (C.A.A.F. 2000) ("A military judge is assumed to know the law and apply it correctly."), and nothing about the lower court's implicit determination that the charges were not unreasonably

19

multiplicious invites this Court to reconsider its judgment.

## V.  Preemption

Finally, Appellant suggests that Article 104, UCMJ, preempts the Article 134, UCMJ, offenses in this case.  By its text, Article 134, UCMJ, applies to offenses "not specifically mentioned in [Chapter 47 of Title 10, UCMJ]."  The President expounded upon this language and placed the following limitation on Article 134, UCMJ, in the MCM:

> The preemption doctrine prohibits application of Article 134 to conduct covered by Articles 80 through 132.  For example, larceny is covered in Article 121, and if an element of that offense is lacking -- for example, intent -- there can be no larceny or larceny-type offense, either under Article 121 or, because of preemption, under Article 134.  Article 134 cannot be used to create a new kind of larceny offense, one without the required intent, where Congress has already set the minimum requirements for such an offense in Article 121.

MCM pt. IV, para. 60.c(5)(a).  Although the effect of this limitation seems clear, this Court has long placed an additional requirement on the application of the preemption doctrine that has greatly restricted its applicability:

> [S]imply because the offense charged under Article 134, UCMJ, embraces all but one element of an offense under another article does not trigger operation of the preemption doctrine.  In addition, it must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way.

United States v. Kick, 7 M.J. 82, 85 (C.M.A. 1979).  Thus, we have required Congress to indicate through direct legislative

20

language or express legislative history that particular actions or facts are limited to the express language of an enumerated article, and may not be charged under Article 134, UCMJ. See, e.g., id. ("We do not agree that the legislative history of [Articles 118 and 119, UCMJ, 10 U.S.C. §§ 918, 919] indicates a clear intent to cover all homicides to the extent of eliminating negligent homicide as an offense under Article 134, UCMJ."); United States v. Taylor, 17 C.M.A. 595, 597, 38 C.M.R. 393, 395 (1968) ("There is, therefore, nothing in the legislative background of Article 115 to compel the conclusion that Congress intended to restrict criminal responsibility for self-injury to those acts delineated in the Article."); United States v. Taylor, 12 C.M.A. 44, 45-47, 30 C.M.R. 44, 45-47 (1960) (analyzing congressional intent regarding Articles 121 and 130, UCMJ, 10 U.S.C. §§ 921, 930, through statutory interpretation, comparison to other federal statutes, and review of legislative history). Appellant has not challenged the continued vitality of this Court's preemption precedent, merely its application to the facts of this case.

But the legislative history of Article 104, UCMJ, does not clearly indicate that Congress intended for offenses similar to those at issue to only be punishable under Article 104, UCMJ, to the exclusion of Article 134, UCMJ. Furthermore, while the two charges in this case have parallel facts, as charged they are

21

nonetheless directed at distinct conduct. The Article 104, UCMJ, charge was directed at Appellant's attempt to aid the enemy directly. The Article 134, UCMJ, charge was directed towards the distribution of sensitive material to individuals not authorized to receive it -- in this case Criminal Investigation Command agents posing as the enemy, but the reasoning could just as easily be applied to the distribution of information to individuals who are not necessarily the enemy, such as a newspaper reporter, or for that matter the private citizen who first encountered Appellant on the "Brave Muslim" website. Unlike Article 104, UCMJ, the general offense as charged prohibits the dissemination of the information regardless of the intent behind that dissemination. If this distinction was not permissible in light of Article 104, UCMJ, Congress was free to clearly state that Article 104, UCMJ, supersedes Article 134, UCMJ, in this context. Appellant's preemption argument is therefore rejected.

## VI.  Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.