*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
CRISFIELD, HITESMAN, and GASTON
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Damon X. HEDGECOCK**
Intelligence Specialist First Class (E-6), U.S. Navy
Appellant

**No. 201800333**

Argued: 5 May 2020—Decided: 29 May 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Shane E. Johnson

Sentence adjudged 19 June 2018 by a general court-martial convened at Joint Base Pearl Harbor—Hickam, Hawaii, consisting of officer members. Sentence approved by the convening authority: reduction to pay grade E-1, confinement for ten years, and a dishonorable discharge.

For Appellant:
*Lieutenant Gregory Hargis, JAGC, USN*

For Appellee*:*
*Major Clayton L. Wiggins, USMC (argued)*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN (on brief)*
*Lieutenant Joshua C. Fiveson, JAGC, USN (on brief)*

Chief Judge CRISFIELD delivered the opinion of the Court, in which Senior Judges HITESMAN and GASTON joined.

*29 May 2020: Admin. correction to counsel name & footnote 10 errata.*

_____

## PUBLISHED OPINION OF THE COURT

_____

CRISFIELD, Chief Judge:

Contrary to his pleas, Appellant was convicted of one specification of maiming and one specification of obstruction of justice, in violation of Articles 124 and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 924 and 934 (2012).[1] Appellant now raises four assignments of error [AOEs]: (1) the military judge abused his discretion by denying Appellant's motion to compel the Government to appoint a neuropsychologist as an expert consultant to assist the Defense team; (2) the military judge abused his discretion by denying Appellant's request for a continuance prior to trial; (3) the military judge committed plain error by allowing the Government to introduce evidence that Appellant offered to pay for J.A.W.'s medical expenses; and (4) the evidence is legally and factually insufficient to sustain Appellant's conviction for maiming.[2] We find merit in AOE (3), but find that any error resulted in no prejudice to Appellant. We therefore affirm the convictions and sentence.

## I. BACKGROUND

Appellant, a married man, started a casual sexual relationship with J.A.W., a man he met on-line. At first, Appellant hid the fact that he was married from J.A.W., but J.A.W. eventually found out. As J.A.W. became more serious about the relationship he pressured Appellant to leave his wife. Appellant sought to appease J.A.W. by weaving an elaborate lie about his deteriorating relationship with his wife, who at this point was unaware of her husband's homosexual love affair. Appellant's lies to J.A.W. included forged

---

[1] Appellant was also convicted of aggravated assault, as a lesser included offense of attempted murder, but the military judge found that offense was part of a single course of conduct with the maiming offense and conditionally dismissed it.

[2] AOE (4) is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Having carefully considered that assignment of error, we find it to be without merit. *See United States v. Clifton,* 35 M.J. 79 (C.M.A. 1992); *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988).

police reports and divorce documents, all designed to convince J.A.W. that Appellant and he would soon be able to start an exclusive life together.

Appellant and J.A.W.'s relationship culminated in Appellant paying for J.A.W. to fly to Hawaii, where Appellant was stationed, ostensibly so they could start a life together as a couple with Appellant's children. The glitch in Appellant's plan was that his wife, children, and mother-in-law were still residing in his house and he had made no arrangements whatsoever for accommodations for J.A.W., who thought he was going to live in Appellant's house. J.A.W.'s introduction to Hawaii consisted of Appellant driving him around the island for 12 hours while Appellant was trying to figure out what to do next. J.A.W., who had flown from the East Coast to Hawaii, grew increasingly upset as time went by. He demanded to either be taken to Appellant's home so he could meet Appellant's children, shower, and rest, or to the airport, so he could leave Hawaii. Appellant first took J.A.W. back to the airport, where they had a heated argument in which J.A.W. threatened to call Appellant's mother and command to inform them about their relationship. Appellant then agreed to take J.A.W. to his house.

When they arrived in the driveway of Appellant's house, Appellant entered the house while J.A.W. waited in the car. Appellant soon came outside, opened the garage door, moved J.A.W.'s luggage into the garage, and closed the garage door. Appellant and J.A.W. stayed in the garage for some time, holding each other, when J.A.W. said he wanted to enter the house, picked up his luggage, and turned toward the door to go in. Appellant picked up a hammer which was lying on the floor under a pair of gym shorts and repeatedly struck J.A.W. on the head with it, fracturing his skull in several places, causing multiple lacerations to his scalp and face, and injuring his hand where he attempted to defend himself against the attack.

J.A.W. fell to the ground under the weight of the blows and pleaded with Appellant to stop hitting him. Appellant ceased the attack and helped J.A.W., who maintained consciousness, to staunch the bleeding. Appellant took J.A.W. to the hospital in his car and they agreed that they would tell authorities that J.A.W. was attacked by a stranger. When questioned by police, Appellant told them that J.A.W. had been attacked by a homeless man.

Appellant managed to convince J.A.W. that he had blacked-out during the assault and did not know why he had done it. He stated that he wanted to stay in a relationship with J.A.W. J.A.W. also wished to maintain the relationship. That changed about a week later when he learned that Appellant was not divorced from his wife and his wife had actually been inside the house when J.A.W. was attacked in the garage. J.A.W. then went to police and told them what had happened.

Appellant was interviewed by Special Agents of the Naval Criminal Investigative Service [NCIS]. He denied any intent to kill J.A.W. and initially claimed that he did not remember hitting him with the hammer. Over the course of the interview, however, Appellant admitted repeatedly striking J.A.W. in the head with a hammer and provided a detailed description and reenactment of the assault.

Appellant was charged with attempted murder, maiming, and obstruction of justice. Prior to trial, Appellant moved to compel the Government to provide two named expert assistants: a forensic psychologist, Doctor A, and a neuropsychologist, Doctor B. According to Appellant, the assistance of a neuropsychologist was necessary to review the "possibility that [Appellant's] actions were the result of a neuropsychological phenomenon."[3] Appellant maintained the assistance of a forensic psychologist was necessary to determine if "psychological phenomenon, such as Post Traumatic Stress Disorder [PTSD] . . . and flashbacks interfered with [Appellant's] ability to process reality at the time of the offense."[4] The focus of both experts' assistance would be on Appellant's capability to form specific intent to kill or injure at the time of the assault.[5]

Doctor B testified on the motion regarding the role of a neuropsychologist, but he had not reviewed any evidence in the case, had no knowledge of whether Appellant suffered from a neuropsychological injury, and stated that his opinion that Appellant might have neuropsychological issues was "purely speculative." The military judge noted that the Defense had provided evidence of psychological trauma, but no evidence of neurological injury to support the motion. He delayed his ruling to give the Defense 48 hours to provide further evidence. The Defense subsequently submitted a letter from Doctor B, in which he stated that he had reviewed Appellant's neuropsychological screening results and believed that there were areas that needed to be explored further.

The military judge also reviewed the report from Appellant's Rule for Court-Martial [R.C.M.] 706 mental health evaluation. The psychologist who conducted that evaluation noted that Appellant had likely experienced a traumatic event in his past and noted that a "diagnostic consideration" was

---

[3] Appellate Ex. VIII at 8.

[4] *Id*. at 6.

[5] *Id*. at 6, 10.

"Conversion Disorder."[6] The evaluator diagnosed Appellant with "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct."[7] He also determined that Appellant did not suffer from a severe mental disease or defect and did not have a "severe, organic pathology."[8]

The military judge granted Appellant's motion to compel production of a forensic psychologist, but allowed the Government to find an adequate substitute for Doctor A, which the Government did. The military judge denied Appellant's motion to compel production of a neuropsychologist, finding that the Defense presented no evidence that Appellant suffered any illness or injury to his neurological system or brain.[9]

A little more than two weeks before trial was scheduled to start, Appellant informed the military judge that he had received third-party funding to hire Doctor A and Doctor B to assist the Defense. He informed the military judge that he would move for a continuance to procure their services. Five days later Appellant filed a written motion for a continuance. He stated that the contracting process to secure the funding would take about 30 days.

The continuance motion was litigated ten days before trial was scheduled to start. The military judge noted that Appellant had provided no evidence to support his motion. He also noted that the Defense had already been provided an adequate substitute for Doctor A, and that he had prior ruled that the assistance of Doctor B was not necessary. The military judge denied the continuance motion but invited Appellant to make a supplemental filing if he had evidence to present. Appellant did not provide anything further on the motion.

## II. DISCUSSION

### A. The Military Judge Did Not Abuse His Discretion by Denying Appellant's Motion to Compel the Appointment of a Neuropsychologist As an Expert Consultant

Appellant asserts that the military judge abused his discretion when he denied Appellant's request to compel the Government to provide a neuropsy-

---

[6] Appellate Ex. XX at 8.

[7] *Id*. at 10.

[8] *Id*. at 11.

[9] Appellate Ex. XXIV.

chologist as an expert consultant to the Defense team. We review a military judge's denial of a request for expert assistance for an abuse of discretion. *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005). A military judge abuses his discretion if (1) his findings of fact are not supported by the evidence, (2) he uses incorrect legal principles, or (3) his application of the correct legal principle to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010). "The abuse of discretion standard is a strict one, calling for more than a mere difference in opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

On a motion to compel the production of expert assistance, "the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008) (citation omitted). As described in *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) and *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994), in order to demonstrate that the expert would be of assistance to the Defense, the moving party must show (1) why expert assistance is necessary; (2) what the expert would accomplish for the Defense; and (3) why defense counsel is unable to gather and present evidence that the expert would be able to develop.

We find that the military judge did not abuse his discretion in denying Appellant's request for the assistance of a neuropsychologist by finding that neither the first nor second prongs of the *Gonzalez* test were met. Specifically, the military judge determined that the Defense failed to present any evidence that the Accused suffered from any form of brain dysfunction or neurological condition warranting further evaluation. He also determined that the Defense failed to present any evidence that the sexual abuse Appellant suffered as a child impacted his brain development or that he ever suffered from PTSD.[10]

---

[10] During appellate review Appellant moved to attach a document purporting to be a post-trial mental assessment of Appellant which included a diagnosis of post-traumatic stress disorder. As this evidence was not provided to the military judge on the pretrial motion to compel, we denied Appellant's motion to attach. Notwithstanding our decision, Appellant's brief includes an appendix containing the document and his brief includes references to the document. Appellee's answer brief also includes a discussion of the document. This document is not part of the record of trial. Art. 66(c), UCMJ, 10 U.S.C. § 866(c) (2012). We have not considered the document nor the

The military judge noted that Doctor B stated he had no knowledge of whether Appellant had a neuropsychological deficiency or whether Appellant's brain was functioning normally. Doctor B's opinion that further testing of Appellant was warranted was based on a neuropsychological screening test that the Defense declined to produce for the motion. According to Doctor B, that screening test indicated that Appellant had a weakness in neurological function, but that his function was still within a normal range. Thus, Doctor B's opinion that Appellant might have neuropsychological issues was, as he himself stated, "purely speculative."

Two other facts are relevant to our conclusion. First, the R.C.M. 706 examiner found that Appellant did not have a severe mental disease or defect at the time of the offense, which reinforced the military judge's finding that there was no evidence that Appellant suffered from a neurological deficiency. Hence, there was nothing clearly erroneous about the military judge's finding that Appellant failed to present sufficient evidence that he suffered from a neuropsychological deficiency.

Second, the military judge approved the Defense's motion to compel the Government to provide assistance from a forensic psychologist, which the Government did. This expert was in a position to assist the Defense in perfecting its argument for the necessity of specialized assistance from a neuropsychologist. Nonetheless, the Defense never re-approached the military judge or sought to fill the gaps the military judge identified with respect to its request for assistance from a neuropsychologist. *See generally*, *United States v. Gunkle*, 55 M.J. 26 (C.A.A.F. 2001) (failure to renew a request for an expert witness may serve to waive the issue).

The military judge's findings of fact were supported by the evidence; he used correct legal principles; and his application of the legal principles to the facts was reasonable. *Ellis*, 68 M.J. at 344.

Assuming arguendo that there was error in the denial, we find no prejudice. The test for prejudice due to a military judge's abuse of discretion is whether the error materially prejudiced an appellant's substantial rights. *United States v. Lee*, 64 M.J. 213, 218 (C.A.A.F. 2006) (citing Article 59(a), UCMJ). Where denial of an expert deprives an appellant of the right to present a defense to the "linchpin of the prosecution case," the error takes on

related discussion in the parties' briefs in reaching our decision. *See United States v. Lloyd*, 69 M.J. 95, 100 (C.A.A.F. 2010) ("In reviewing a military judge's ruling for abuse of discretion . . . we review the record material before the military judge.").

a constitutional dimension and must be harmless beyond a reasonable doubt to avoid reversal. *United States v. McAllister*, 64 M.J. 248, 252 (C.A.A.F. 2007).

At the time Appellant made his motion for expert assistance he was charged with attempted murder, which requires proof of a specific intent to kill the victim. Appellant was acquitted of attempted murder, however. He was convicted of the specific-intent offense of maiming, which requires only the specific intent to injure. However unlikely, we assume for the sake of argument that Appellant's requested neuropsychologist could have rendered an opinion that Appellant could not, or did not, form the specific intent to injure J.A.W. at the time of the assault, which would inure to Appellant's benefit on the merits in this case.

Even had a neuropsychologist rendered such an opinion, in light of the evidence adduced at trial regarding Appellant intentionally and repeatedly striking J.A.W. in the head with a hammer, we find beyond a reasonable doubt that the members would still have found Appellant had the specific intent to injure J.A.W. *See McAllister*, 64 M.J. at 248. The Government case on the maiming offense was extremely strong, and the actus reus was never contested by the Defense. The detailed testimony of J.A.W. regarding the circumstances of the attack, Appellant's inculpatory statements to NCIS and his psychotherapist, and Appellant's own testimony at trial all strongly support the finding that Appellant intended to injure J.A.W.[11]

## B. The Military Judge Did Not Abuse His Discretion by Denying Appellant's Continuance Request

We review a military judge's decision to deny a continuance for abuse of discretion. *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997). A military judge abuses his discretion when his reasons for denial are "clearly untenable and . . . deprive a party of a substantial right such as to amount to a denial of justice." *Id*. at 358.

In *Miller*, the Court of Appeals for the Armed Forces [CAAF] articulated twelve factors relevant to a military judge's consideration of a continuance request. Those factors include:

---

[11] At trial, Appellant testified that he repeatedly hit J.A.W.'s head with a hammer in order to protect his family from J.A.W. Given the method he chose, the only way the hammer was going to accomplish that goal was if it injured J.A.W.

surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.

*Id.*, (quoting Francis A. Gilligan & Fredric I. Lederer, *Court-Martial Procedure* § 18-32.00, 704 (1991)). These factors overwhelmingly weigh in favor of our conclusion that the military judge did not abuse his discretion in denying Appellant's continuance request.

The Defense presented no evidence in support of its continuance request. This obviously frustrated the military judge, who refused to accept evidentiary proffers from the Defense. Furthermore, the Defense could not explain (a) why the substitute forensic psychologist provided by the Government was inadequate for the Defense, or (b) why the assistance of a neuropsychologist necessitated postponing the trial when the military judge had ruled earlier that the Defense had not demonstrated the necessity of such an expert. These were two obvious questions that the Defense should have anticipated and been prepared to address, but they did not. The military judge offered the Defense the opportunity to submit a supplemental filing containing evidence to support its request, but the Defense did not take advantage of the opportunity. This particular *Miller* factor weighs heavily against the Defense and is sufficient alone for us to conclude that the military judge did not abuse his discretion.

The other *Miller* factors only reinforce that conclusion. The Defense could not state a date certain when it would be ready to proceed to trial. It proffered that the two experts would be available for trial in three months, but could not state when it would actually have funds in hand to pay for the two experts. We also find there is no reasonable probability that the addition of a neuropsychologist and a second forensic psychologist to the Defense team would have changed the verdict.

### C. It Was Plain Error For the Military Judge to Permit the Government to Introduce Evidence That Appellant Offered to Pay For J.A.W.'s Medical Expenses

Appellant asserts that the military judge committed plain error by allowing the Government, in violation of Military Rule of Evidence [Mil. R. Evid.] 409, to present evidence that Appellant offered to pay for J.A.W.'s medical bills resulting from Appellant's attack. We agree with Appellant, but find no prejudice from the error.

In pretrial motions the Government signaled its intent to present evidence that Appellant paid for J.A.W.'s medical bills resulting from the assault. The military judge inquired: "You're showing consciousness of guilt where he's paying for his medical bills?" The trial counsel answered, "Yes, sir."[12]

The Defense made no motion in limine to exclude such evidence, but chose instead to incorporate the evidence in its theory of the case that J.A.W. was a "Craigslist conman"[13] who was scheming to wring every dollar he could out of the Appellant. The first time the members heard anything about Appellant paying for J.A.W.'s medical bills was from the defense counsel in his opening statement:

> Because [J.A.W.] wasn't leaving this island until he had that con secured. It worked. He went back to the mainland, and Damon Hedgecock sent him money every month, agreeing to pay his medical bills, sending him reassurances of every type; because as long as that money kept flowing, [J.A.W.] didn't have any complaints. That's what he does. That's what he's good at.[14]

The first evidence introduced about Appellant paying for J.A.W.'s medical bills was from the Government. In its case-in-chief, the Government introduced a videotape of Appellant's interrogation by NCIS. In the course of the interrogation, Appellant described an agreement he had with J.A.W.:

> I'm covering his medical bills. I'm giving him some additional money to cover for wages lost because he lost his part-time serving position when he came out of here, and that I will be handling his medical expenses, if he has any additional bills that are incurred as a result of my actions.[15]

Three separate times in the course of the interrogation, Appellant mentioned that he agreed to pay for J.A.W.'s medical bills and acknowledged that he was responsible for those bills.[16] Once again, the Government stated they were introducing evidence about Appellant paying for J.A.W.'s medical bills

---

[12] Record at 155.

[13] Record at 607, 610, 924, 1285.

[14] *Id.* at 611.

[15] Prosecution Ex. 1 at 12.

[16] *Id.* at 12-13, 15.

as consciousness of guilt. There was no objection from the Defense to this evidence.

During J.A.W.'s testimony during the Government's case-in-chief, the trial counsel asked him: "Did he offer to pay for your medical expenses?" J.A.W. replied: "He did, medical expenses, as well as plastic surgery if I need it."[17] Again, the Government's stated intention for introducing this evidence was to prove Appellant's consciousness of guilt.

There was no objection to this evidence from the Defense, which asked multiple questions about Appellant's payments of the medical expenses during its cross-examination of J.A.W.:

> Q. And you start a discussion with Damon about the medical bills; correct?
>
> A. Yeah. We did have discussions about that.
>
> Q. And that was like an ongoing conversation.
>
> A. Oh, absolutely.[18]

Later in the cross-examination:

> Q. And you were looking for assurances that he would pay these medical bills?
>
> A. Yes, sir, that he agreed to pay.
>
> Q. And he agreed to pay those medical bills; right?
>
> A. [Affirmative response.]
>
> . . . .
>
> Q. He was convinced he would lose his kids if he didn't pay you for the medical bills. Is that true?
>
> A. I don't know that.[19]

---

[17] Record at 843.

[18] Record at 909.

[19] *Id*. at 915-916. During an Article 39(a) session in the course of J.A.W.'s testimony, the defense counsel explained to the military judge his reason for asking these questions: "And it is our argument that [Appellant] only did those things [paying for J.A.W.'s medical expenses and hotel bills] because he was being exploited, because he was being controlled." *Id*. at 932. The military judge then asked the trial counsel: "So, government, why did you put in evidence that—I mean, what was the purpose of the

11

During the Defense's case-in-chief, Appellant testified on direct examination about his offer to pay J.A.W.'s medical expenses:

> Q. Okay. Was there any discussion of money at that time?
>
> A. He made mention of his thousands of dollars in medical bills he would have from it all. I said I was responsible for it and that I would take care of it.
>
> Q. Was he satisfied with just your word about that?
>
> A. No, sir.
>
> Q. So what happened in regards to the money?
>
> A. I made multiple efforts to get copies of the billing information and he would not provide it, citing that it either had to go through a third-party legal or that he would want me to make payments directly to him and then he would pay the medical bills.
>
> Q. First off, did you agree to pay the medical bills?
>
> A. Yes, sir.
>
> Q. How did you agree to that?
>
> A. Verbally, text, and I'd also typed up a paper document and got it notarized citing that I would cover all medical expenses.
>
> Q. Did you have any problem with paying the medical bills?
>
> A. It would have been difficult, but, no, sir. I caused the injuries. I would be responsible for them. I would cover them.
>
> Q. And how did he want to have payment?
>
> A. He wanted me to pay him directly then he said he would pay the bills from there.
>
> Q. And how did you want to make payments?
>
> A. Directly to the medical billers.

---

evidence of paying for the medical bills, paying for the hotel?" The assistant trial counsel responded: "Consciousness of guilt." *Id.* at 932-33.

Q. Why?

A. That way I knew for a fact that I was paying the
medical bills.[20]

Neither party mentioned the evidence of Appellant offering to pay
J.A.W.'s medical bills during their closing arguments.

Mil. R. Evid. 409, entitled "Offers to pay medical and similar expenses,"
states unequivocally: "Evidence of furnishing, promising to pay, or offering to
pay medical, hospital, or similar expenses resulting from an injury is not
admissible to prove liability for the injury." While the rule appears unambig-
uous on its face, the Manual for Courts-Martial's analysis of the rule surpris-
ingly casts doubt on its applicability to courts-martial: "Unlike Rules 407 and
408 which although primarily applicable to civil cases are clearly applicable
to criminal cases, it is arguable that Rule 409 may not apply to criminal cases
as it deals only with questions of 'liability'—normally only a civil matter."
*Manual for Courts-Martial* [MCM], *United States*, Analysis of Military Rules
of Evidence app. 22 at A22-40 (2016 ed.).

We therefore address three issues: (1) Does Mil. R. Evid. 409 apply to
courts-martial?; if so, (2) did the Government violate the rule by presenting
evidence of Appellant's agreement to pay J.A.W.'s medical bills to prove
consciousness of guilt?; and, if so, (3) in the absence of objection from the
Defense, did the military judge commit plain error by allowing the Govern-
ment to present that evidence?

Addressing first the applicability of the rule to courts-martial, although
we have discovered no military justice case in which Mil. R. Evid. 409 has
been interpreted directly, the Court of Military Appeals mentioned the rule in
somewhat ambiguous dicta in *United States v. Nickels*, 20 M.J. 225 (C.M.A.
1985). The appellant in *Nickels* was the custodian of a postal fund that was
found to be $3,000 short. Charged with dereliction in the loss, the appellant
testified that he personally paid for the shortfall in the fund, not because he
was guilty of causing the shortfall, but because he felt responsible for the
fund. In a per curiam opinion, that court implied that under different factual
circumstances, Mil. R. Evid. 409 would have been in issue: "If the Govern-
ment, over defense objection, had sought to introduce the evidence of appel-
lant's payment of the $3,000 *to show a consciousness of guilt* on his part, an

---

[20] *Id.* at 1082-1084. *See also id.* at 1037-1038 ("I would take responsibility for
what I had done and financial responsibility for the medical costs I had forced him to
incur.").

interesting evidentiary question might have been presented. *Cf.* Mil. R. Evid. 407-09." *Nickels*, 20 M.J. at 226 (emphasis added).

While we cannot state with certainty what the *Nickels* court meant by an "interesting evidentiary question," we do not think it meant that the interesting question would be *whether* Mil. R. Evid. 409 applied to the military justice system, but *how* it applied to that particular case.[21] At the time, Mil. R. Evid. 409 was substantially similar to its current version and the rule's analysis in the 1984 Manual was identical to its current version. Hence, we interpret this dicta as some indication from our superior court that not only does the rule indeed apply to courts-martial but that its proscription would be placed in issue by the Government's use of such evidence of remuneration to show consciousness of guilt.

The Government argues that the fact that the rule has not been substantively addressed by military courts bars a finding of plain error:

> No military court has articulated the scope of Mil. R. Evid. 409 and Appellant points to no case law in his Brief interpreting the Rule. Accordingly, under [*United States v. Gonzalez*, 78 M.J. 480 (C.A.A.F. 2019)] the Military Judge could not commit plain and obvious error where he had no authority to compel his decision.[22]

We disagree with Appellee's interpretation of *Gonzalez* and the notion that the plain language of a military rule of evidence is insufficient authority, per se, to support a finding of plain error. *Gonzalez* was not a case where courts had not interpreted an issue. To the contrary, it was the fact that courts had reached *different* interpretations on the relevant issue that made it impossible for CAAF to find that the lower court's error was plain and obvious. Here, we have no case law offering conflicting interpretations of the rule at issue; in fact, we have found *no* binding or even persuasive case law. What we do have is a military rule of evidence with a plain and obvious meaning on its face. We find that such an unambiguous military rule of evidence, even if not elucidated by case law, can constitute a positive rule of law, the transgression of which can constitute a plain and obvious error.

---

[21] The quote is a good example of why the Bluebook strongly recommends that parenthetical explanations accompany "Cf." signals. *The Bluebook: A Uniform System of Citation* R. 1.2, at 59 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015).

[22] Appellee's Answer at 35.

The statement in the drafter's analysis of Mil. R. Evid. 409 that "liability" is "normally only a civil matter" is a curious statement since the concept of criminal liability is replete in the M.C.M. For example, the exceptions to the hearsay rule contained under Mil. R. Evid. 804 mention "criminal liability" twice; the Manual's explanation of Article 77, UCMJ, on principals, speaks of those who might be "liable for an offense" and discusses how to "avoid liability" for an offense by withdrawing from a common venture; the explanation for Article 81, UCMJ, describing the crime of conspiracy, talks about each conspirator's "liability for offenses"; the explanation for Art. 112a, UCMJ, on controlled substances, mentions that an accused who is deliberately ignorant of the contraband nature of a controlled substance will be "subject to the same criminal liability as one who has actual knowledge." We can see no reason why the mere use of the word "liability" in Mil. R. Evid. 409 would render it inapplicable to courts-martial. Thus, we conclude that, notwithstanding the analysis' warning, it is inarguable that this rule, like every other rule contained in the Military Rules of Evidence, does indeed apply to courts-martial.

Having concluded that Mil. R. Evid. 409 applies to courts-martial, we next determine if the Government violated the rule. The Government repeatedly stated to the military judge that it was introducing the evidence to show consciousness of guilt. The Government now asserts that consciousness of guilt is different than liability as contemplated by Mil. R. Evid. 409, essentially arguing that liability is related only to the actus reus, while consciousness of guilt is related to mens rea. We disagree with such a narrow construction of "liability," which is in fact a much broader legal concept. According to Black's Law Dictionary, "liability" means "The quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment . . . ." *Liability*, *Black's Law Dictionary* (10th ed. 2014). As this broader definition of "liability" as meaning legal accountability or responsibility is generally consistent with the way the term is used elsewhere in the M.C.M., discussed above, we adopt this definition of "liability" for purposes of that term's use in Mil. R. Evid. 409, encompassing both the actus reus and mens rea. We therefore conclude that "evidence of furnishing, promising to pay, or offering to pay medical, hospital, or similar expenses resulting from an injury," if admitted to prove "consciousness of guilt," falls within the proscription of the rule. Since the Government used the evidence at issue here for precisely that reason, it did so in violation of Mil. R. Evid. 409.

Having determined that the Government violated Mil. R. Evid. 409, we next need to determine if the military judge committed plain error by allowing the Government to present the evidence in the absence of Defense objection. Under plain error review, Appellant has the burden of demonstrat-

ing that: "(1) there was error, (2) the error was [clear] and obvious, and (3) the error materially prejudiced a substantial right of the accused." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted). In this regard, we first find that allowing the Government to introduce the evidence in violation of the rule was error.

The obvious complicating factor in determining whether the error was clear and obvious is, as discussed above, that the rule's formal analysis in the M.C.M. explicitly questions whether the rule even applies to courts-martial. As the CAAF stated in *Gonzalez*, "an error in the *MCM* is a factor in determining whether an issue is subject to reasonable doubt" and therefore not clear and obvious (*i.e.*, plain error). *Gonzalez*, 78 M.J. at 486-487 (italics in original). However, as also discussed above, this is not a case where different courts have interpreted Mil. R. Evid. 409 differently or where our superior court has issued an ambiguous interpretation, which would make it very difficult to hold that a trial judge's interpretational error was clear and obvious. To the extent our superior court has addressed the rule at all, in *Nickels*, it did so not only in repudiation of the drafter's analysis as to its applicability to courts-martial per se, but also with the strong implication that it specifically applies, as we have now held, to evidence used to show consciousness of guilt. *Nickels*, 20 M.J. at 226.

We also note that neither Mil. R. Evid. 409 nor the accompanying analysis in the M.C.M. was ever referenced by any of the participants in the court-martial. No limiting instruction was requested or provided to the members to instruct them that they could not use the evidence to establish liability. It is therefore unlikely that the military judge, or the counsel, were misled by the faulty analysis since they did not consider the rule. Thus, we find the drafter's analysis, in providing a warning that is both unreasonable and unsupported by case precedent, and in any event was not relied on by the parties, should be given no weight at all, and we will not let it stand in the way of finding that the error was clear and obvious.

Appellee asserts that Appellant invited the Government's error by being the first to introduce the members to the issue of Appellant paying for J.A.W.'s medical bills. We disagree that invited error is applicable here because a party is permitted to introduce evidence of an offer to pay medical expenses as long as the evidence is not introduced "to prove liability for the injury." Mil. R. Evid. 409. The Defense's purpose in introducing the evidence was to show that J.A.W. was a "Craigslist conman" who was scheming to enrich himself at Appellant's expense. That the Defense theory strains

credulity does not mean that the evidence was inadmissible. The Defense did not violate Mil. R. Evid. 409 in admitting the evidence; the Government did.[23]

Having found plain error, we must next test the error for prejudice. Art. 59, UCMJ. As discussed above, the Government case for maiming was extremely strong. Given the fact that the Defense incorporated and used the evidence in support of its own theory of the case, coupled with the fact that the Government did not argue the importance of the evidence to the members, the impact of the Government's admission of the evidence is slight. The cause of J.A.W.'s injuries was never in issue and Appellant repeatedly referred to the fact that he was responsible for J.A.W.'s injuries. The Defense goal at trial was obviously to avoid a conviction for attempted murder. They succeeded in that goal, but never seriously contested the lesser included offense of aggravated assault. Under these circumstances there is no doubt that Appellant was not prejudiced by the Government's introduction of this evidence for purposes of showing liability.

### D. The Promulgating Order Omits Required Information

We note that the convening authority's action fails to reflect that Appellant was arraigned on a charge and two specifications which were subsequently withdrawn before Appellant entered pleas. R.C.M. 1114(c)(1) states that "[t]he order promulgating the initial action shall set forth: . . . the charges and specifications, or a summary thereof, on which the accused was arraigned . . . ." We find no prejudice to Appellant in this error, but he is entitled to accurate post-trial documents. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). We order correction to the promulgating order in our decretal paragraph.

### E. *Moreno* III

We note that this decision is issued 14 days after the *Moreno* III date of 15 May 2020. In assessing whether the total processing time violated Appellant's Due Process right to speedy review of his court-martial, we consider the four factors the CAAF identified in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006): (1) the length of delay; (2) the reasons for the delay;

---

[23] While we can conceive of circumstances in which the Defense first offers evidence of medical-expense payments for a permissible purpose and *then* the Government seeks to use such evidence only to *rebut* the Defense's stated purpose, those circumstances are not present in this case.

(3) Appellant's assertion of his right to a timely review; and (4) prejudice to Appellant.

The length of the delay is small and was caused by the Court having to re-schedule the oral argument planned for 25 March 2020 due to a health issue with a participant in the oral argument.[24] The oral argument was held on 5 May 2020, and the Court moved quickly thereafter to render its decision. Appellant remains in confinement, and in light of our conclusions we assess that he has not been prejudiced by this delay. Therefore, we find no violation of Appellant's Due Process rights.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and find no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED**. The supplemental court-martial order will correctly indicate that Appellant was arraigned on a second specification under Charge I that was subsequently withdrawn, and an original Charge III and a single specification thereunder that were also subsequently withdrawn. It will also note that the original Charge IV was renumbered as Charge III after the original Charge III was withdrawn.

Senior Judges HITESMAN and GASTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[24] The health issue was related to the ongoing coronavirus pandemic, which has thus far impeded normal operations by this Court for several weeks and necessitated handling the rescheduled oral argument via teleconference.